*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0288p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICHAEL WILLIAMSON, et al.,
     *Plaintiffs-Appellees,*

  *v.*

RECOVERY LIMITED PARTNERSHIP,
COLUMBUS EXPLORATION, LLC, and
COLUMBUS-AMERICA DISCOVERY GROUP
INC. (11-3723); RECOVERY LIMITED
PARTNERSHIP, COLUMBUS EXPLORATION,
LLC, and THOMAS G. THOMPSON (12-3949),
     *Defendants-Appellants.*

Nos. 11-3723/12-3949

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:06-cv-00292—Edmund A. Sargus, Jr., District Judge.

Argued: June 14, 2013

Decided and Filed: October 2, 2013

Before: BOGGS and SUHRHEINRICH, Circuit Judges; and MURPHY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Christopher L. Trolinger, FARLOW & ASSOCIATES LLC, Dublin, Ohio, for Appellants. Michael J. Frevola, HOLLAND & KNIGHT, LLP, New York, New York, for Appellees. **ON BRIEF:** Christopher L. Trolinger, FARLOW & ASSOCIATES LLC, Dublin, Ohio, for Appellants. Michael J. Frevola, HOLLAND & KNIGHT, LLP, New York, New York, Michael R. Szolosi, Sr., MCNAMARA AND MCNAMARA, L.L.P., Columbus, Ohio, for Appellees.

---

[*]The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**OPINION**

---

BOGGS, Circuit Judge.  This appeal is the latest skirmish in the legal battle over the treasures recovered from the of the 19th-century steamship *S.S. Central America*, a battle that has spanned three decades and numerous courts.  Dubbed the "Ship of Gold,"[1] the *Central America* sank in the Atlantic Ocean in September 1857, taking over 400 passengers and many tons of gold with her.  Her wreckage was discovered over 130 years later by a group of explorers led by Thomas Thompson, in what remains one of the most significant finds in maritime history.  One jurist described the feat as "a paradigm of American initiative, ingenuity, and determination."[2]

Ominously, the same jurist opened his opinion with words that are equally fitting: "*Quid non mortalia pectora cogis, Auri sacra fames*!"[3]  The individuals who dedicated their time and talent to the recovery of the *Central America* have not seen a dime of their promised share of the spoils; Thompson is a fugitive from the law, actively pursued by United States Marshals; and the vast wealth representing the ship's golden cargo is as lost today as it was before September 1988.

The instant consolidated appeal concerns a suit brought by a group of plaintiffs who assisted Thompson in locating the wreckage of the *Central America*.  All signed non-disclosure agreements with Thompson, through his business entities, promising to hold his projects and ideas in confidence in exchange for a percentage of the net recovery of the *Central America*.  All claim to have upheld their respective ends of the bargain, yet none have received payment.  The business entities respond by asserting a

---

[1] *See generally* GARY KINDER, SHIP OF GOLD IN THE DEEP BLUE SEA: THE HISTORY AND DISCOVERY OF THE WORLD'S RICHEST SHIPWRECK (1998).

[2] *Columbus–Am. Discovery Grp. v. Atl. Mutual Ins. Co.* [*CADG II*], 56 F.3d 556, 576 (4th Cir. 1995) (Hall, J.).

[3] "To what cannot you compel the hearts of men, O cursed lust for gold!"  *Id.* at 561 (quoting Virgil, *Aeneid*, Bk. III 56).

two-year statute of limitations for actions in salvage and three counterclaims. The district court rejected the business entities' time-bar argument and granted summary judgment against all of their counterclaims. The defendants took an interlocutory appeal of that decision. During the pendency of that appeal, the district court granted a motion for prejudgment attachment and an injunction against one of the business entities and Thompson, forbidding them from divesting certain assets. The two defendants took an interlocutory appeal of that order as well. We consolidated the two appeals.

This appeal requires us to resolve several complex questions of federal jurisdiction and admiralty law. We must first decide which issues we have jurisdiction to hear. In response to the parties' jurisdictional motions in the two appeals, we will assert jurisdiction over the time-bar issue, all of the entity defendants' counterclaims, and the injunction defendants' appeal of the attachment and injunction order insofar as the district court issued a preliminary injunction. As to other issues, we refuse to entertain the appeal for want of jurisdiction.

We must then turn to the substantive issues over which we have jurisdiction. We must first determine whether or not the plaintiffs' action is time barred. We hold that the time bar does not apply. Next, we must address the district court's grant of summary judgment against the entity defendants' counterclaims. As the entity defendants have failed to raise an issue of fact material to the disposition of the case, we affirm the district court's order. Finally, we must assess whether or not the district court abused its discretion in granting a preliminary injunction against Thompson and one of the business entities. We hold that it did not. For the reasons discussed in detail below, we affirm the district court in full as to all issues over which we have jurisdiction.

I

A

The tale of the last days of the *S.S. Central America* has been retold many times by many courts throughout the many years of litigation in this case. None, however,

match the excellence of the narrative given by the late Judge Donald Russell of the Fourth Circuit:

> The year 1857 is justly famous in American history for its many notable events. Among these was the beginning of a fairly serious financial decline, the aptly named Panic of 1857. Associated with the Panic, and another reason why the year is so famous, is one of the worst disasters in American maritime history, the sinking of the S.S. CENTRAL AMERICA.
>
> The CENTRAL AMERICA was a black-hulled, coal-fired, three-decked, three-masted sidewheeler with a cruising speed of eleven knots. Built in 1852, and launched the following year, she carried passengers, mail, and cargo between Aspinwall, Colombia (on the Caribbean side of the isthmus of Panama), and New York City, with a stopover in Havana. Most, if not all, of her passengers were headed to or from California, the route being one leg of the then quickest way between the west coast and the eastern seaboard-from California to the Pacific side of the isthmus of Panama aboard a steamship, across the isthmus on the Panama Railroad, and then from Aspinwall to New York aboard another steamship. Owned by the U.S. Mail and Steamship Company and originally named the S.S. GEORGE LAW (until June 1857), the CENTRAL AMERICA completed forty-three voyages between Panama and New York in her four years of operation. During this period, the California gold rush was in full swing, and it has been said that the ship carried one-third of all gold shipped at that time from California to New York.
>
> In August of 1857, over four hundred passengers and approximately $1,600,000 (1857 value) in gold (exclusive of passenger gold) left San Francisco for Panama aboard the S.S. SONORA. Many of the passengers were prospectors who had become rich and were returning home, either for good or to visit. Also on board were California Judge Alonzo Castle Monson, who resigned from the bench after losing his house and all his money in a famous poker game, and Mrs. Virginia Birch, a.k.a. "the notorious Jenny French," a former dance hall girl well known in San Francisco. As for the gold, it was being shipped by California merchants, bankers, and express companies, including Levi Straus and Wells Fargo, to New York banks, the banks wanting specie to stave off the effects of the financial downturn.
>
> The travellers and the cargo reached Panama without incident, and they crossed the isthmus by rail. On September 3, over six hundred people came aboard the CENTRAL AMERICA, as well as $1,219,189 of the gold shipped on the SONORA, the remainder being shipped to England aboard a different vessel. The CENTRAL AMERICA first headed for Havana, which was reached on September 7. There, the ship

lay over for a night, and some of the passengers debarked to catch another vessel for New Orleans. On September 8, under clear skies, the CENTRAL AMERICA left Havana for New York, carrying approximately 580 persons and her golden treasure.

On the second day out of Havana, the weather changed and a mighty storm came up. What the passengers and crew could not know was that they were headed directly into the teeth of a ferocious hurricane. As the storm worsened around the CENTRAL AMERICA, a leak developed and soon water was rushing into the boat. The water extinguished the fires in the ship's boilers, and this in turn caused the ship's pumping system to fail. All able male passengers began a systematic bailing of water out of the ship, but it was to no avail; after thirty frantic hours, the boiler fires would still not light and the water level continued to rise.

Knowing the situation was hopeless, Captain William Lewis Herndon managed to hail a passing ship, the brig MARINE, and one hundred persons, including all but one of the women and children aboard, were safely transferred to the other ship. Time and conditions would not allow for any more transfers, however, and shortly after 8 p.m. on September 12, the CENTRAL AMERICA began making its quick descent to the bottom of the ocean.

After being flung into the sea, many of the men managed to come to the top and float there, desperately holding onto any buoyant material available. Six to nine hours after the sinking, fifty of these men were rescued by the Norwegian bark ELLEN. Earlier, a small bird had thrice circled the ELLEN and flown directly into the face of the ship's captain. Taking this as a sign, the captain changed his course to follow from whence the bird had come, and in so doing discovered the fifty floating survivors. Three other men were also rescued when, nine days later and 450 miles away, a ship spotted their lifeboat, which had been riding the Gulf Stream.

In all, 153 persons were rescued, while approximately 425 lost their lives. Also lost were hundreds of bags of mail and the $1,219,189 in gold. At the time, there were rumors that other commercial shipments of gold were aboard, but these were quickly discounted. It is true, though, that a significant amount, probably several hundred thousand dollars worth (1857 valuation), of passenger gold was lost. Many passengers had with them their earnings from several years' labor in the California gold fields. Some kept this gold on their person, while others carried it in carpetbags or trunks. Also, passenger gold could have been checked with the ship's purser, although these records were lost with the ship. Captain Thomas W. Badger is one example of a passenger carrying gold, he having lost $17,500 of it stored in a carpetbag. Also, the newspapers reporting the disaster contained vivid accounts of men

flinging down their hard earned treasure in disgust upon realizing their impending doom.

Needless to say, for the next several weeks newspapers around the country devoted much space to the disaster which befell the CENTRAL AMERICA. While people mourned the over four hundred persons who had valiantly lost their lives, they also feared that the loss of such a large amount of specie would exacerbate the country's already serious financial situation. The commercial shipments of gold had been insured, though, and the insurance underwriters began advertising in the newspapers that they would pay off their commitments upon the proper proofs being presented. Approximately one-third of the treasure had been underwritten by New York insurers while the rest was underwritten in London. Without doubt, most, if not all, of the claims were promptly paid off by the underwriters.

Under applicable law, then and now, once the underwriters paid the claims made upon them by the owners of the gold, the treasure became theirs. Thus, less than two weeks after the disaster, the underwriters began negotiating with the Boston Submarine Armor Company about possibly raising the ship and her cargo. Also, on June 28, 1858, two of the underwriters (Atlantic Mutual Insurance Company and Sun Mutual Insurance Company) contracted with Brutus de Villeroi, a Frenchman then living in Pennsylvania, to salvage the gold. The contract states that de Villeroi, "by means of his Invention of a Submarine boat" and at his own expense, would raise the treasure and receive a salvage award of seventy-five percent. At this time, though, no one was quite sure where the boat had gone down, or in how deep of water. At first, some estimated the ship was in only twenty-eight fathoms of water (168 feet), when in fact it was over 8,000 feet below the surface. As would be expected, nothing came of the salvage attempts in the late 1850s, and the issue, and the gold, would lie dormant for over a hundred and twenty years.

*Columbus–Am. Discovery Grp. v. Atl. Mutual Ins. Co.* [*CADG I*], 974 F.2d 450, 455–57 (4th Cir. 1992).

B

Advances in sonar-search and deep-sea-recovery technology brought renewed interest in locating the *Central America* in the late 1970s and 1980s. Thomas Thompson incorporated the Columbus–America Discovery Group in order to lead the efforts to recover the ship and her golden payload. Through a related business entity, Recovery Limited Partnership, Thompson began soliciting investors to back his venture and

assembling a crew to help him locate the *Central America*. Relevant to this matter, Thompson executed two documents with each employee—an employment contract and a non-disclosure agreement. The employment contracts were fairly standard, promising a modest daily wage in exchange for services rendered. The non-disclosure agreements, on the other hand, were far more valuable. In exchange for maintaining the secrecy of Thompson's operations, theories, work product, and the like, each employee was to receive a share of the "net recovery" of the venture. In addition to employing the crew, Recovery Limited rented a side-scan sonar from plaintiff International Deep Sea Survey, Inc. Again, the parties executed a lease agreement and a separate non-disclosure agreement.

Thompson and his colleagues located the *Central America* in September 1988 off the coast of South Carolina. Using a submersible robot invented by Columbus–America, they began removing millions of dollars in gold coins, ingots, and bars from the wreckage. As one might expect, however, the discovery of such a vast sum of wealth inevitably attracted unwanted attention: dozens of attorneys descended upon Columbus–America, hoping to secure a piece of the golden booty for the numerous insurance companies, underwriters, and banks that claimed title to the ship and her payload. Thus began the first round of litigation over the treasures of the *S.S. Central America*.

The insurance companies initially succeeded in establishing ownership over the gold in the face of Columbus–America's claim under the law of finds. *CADG I*, 974 F.2d at 468. The case was remanded back to district court to determine a proper award for Thompson and his colleagues under the law of salvage. *Ibid.* The court indicated in no uncertain terms that Columbus–America should receive "by far the largest share of the treasure" as just compensation for their efforts. *Id.* at 468–69. Indeed, the group did receive the largest share—90% of a golden haul that remains today one of the largest treasure finds in history. *CADG II*, 56 F.3d at 562. As a salvor, Columbus–America never took title to the gold, but it remained in possession of the entire haul as the central marketing authority responsible for liquidating the treasure. *Id.* at 574–75. The Fourth

Circuit closed this chapter of the litigation by applauding Thompson's efforts: "What Thompson and Columbus–America have accomplished is, by any measure, extraordinary. We can say without hesitation that their story is a paradigm of American initiative, ingenuity, and determination." *Id.* at 576.

C

One might have hoped that the Fourth Circuit's 1995 opinion would have marked the end of the litigation over the *Central America*. Alas, efforts to market the treasure generated further legal woes. Thompson initially tried to sell the gold through Christie's New York. These efforts failed and resulted in a lawsuit. Thompson looked next to the West Coast, signing an agreement in 1999 with California Gold Marketing Group, LLC on behalf of Recovery Limited and Columbus–America. By this time, Thompson's crew had grown nervous about not having been paid their share of the treasure. Thompson's lawyer responded to these concerns in a March 2000 letter:

> On the marketing front, retail sales have been very robust to date. Three of the largest numismatic dealers in the world are involved, and progress has been encouraging. (*Coin World* and *Numismatic News* have been carrying information about the gold tours, and should be a good source for announcements by the California Gold [Marketing] Group). . . .
>
> The California Gold [Marketing] Group's purchase of 92.4% of the treasure awarded to Columbus–America has resulted in settlements with Christie's and the Bank of California. The end result appears essentially to be the elimination of those claims, with a pay-off of approximately $43 million. (The newspaper reports on payments of $50 million and $100 million, respectively, are inaccurate).
>
> While the terms of the agreement are confidential, essentially it provides, in addition to the sums paid Christie's and the Bank of California, for a split of profits between Columbus–America and the California Gold [Marketing] Group, with the percentages varying depending on who procures the buyer's [sic] and the amount of sales made.
>
> To date, there has been no net profit to Columbus–America. The Group is very hopeful that profits may be obtained within the next 6–12 months, as sales progress.
>
> It has been, and remains, Tommy's intention to make payment to Don Craft and others of like standing their pro rata portion of the profits due to them under the Non–Disclosure Agreements simultaneously with

his receipt of any net profits.  Tommy is grateful for the work done and
is as anxious for net profits as anyone.
          We should have a much better idea of the nature and size of those
net profits as sales progress over the next several months.

The plaintiffs allege that Thompson's lawyer further represented that Thompson retained a reversionary interest in the treasure, from which the plaintiffs would assuredly be paid.  Subsequent litigation reveled, however, that Thompson sold this reversionary interest, allegedly in a June 2001 amendment to his agreement with California Gold Marketing Group.

D

The latest salvo of litigation began in 2005 and 2006, when various parties brought suit against the defendants in three separate actions filed in the Court of Common Pleas for Franklin County, Ohio.  The matters were consolidated, and the defendants removed the action to the United States District Court for the Southern District of Ohio in April 2006.  The plaintiffs involved in the instant appeal, referred to throughout the litigation as the "Williamson Plaintiffs," are a group of employees hired to assist in the location and recovery of the *Central America* (Michael E. Williamson, the estate of Don C. Craft,[4] Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, and Dale Schoeneman), as well as the company from which Thompson rented a side-scan sonar, International Deep Sea Survey, Inc.  The plaintiffs brought suit against Thompson and the board of directors of Columbus Exploration, LLC[5] ("the individual defendants") and numerous business entities, including Recovery Limited, Columbus–America, and Columbus Exploration ("the entity defendants").  The plaintiffs demanded monetary relief for breach of their non-disclosure agreements, conversion of the recovered gold, and breach of fiduciary duty.  The plaintiffs also requested the imposition of a constructive trust upon the

---

[4] Mr. Craft passed away early in the course of this litigation, and his estate was substituted as the successor party-in-interest.

[5] Columbus Exploration was formed in 1998 in order to market the recovered gold and fulfill the contractual obligations of Recovery Limited.

defendants and an accounting of the defendants' finances.  The entity defendants answered by raising a host of affirmative defenses and lodging three counterclaims of their own: breach of contract, civil conspiracy, and unfair competition.

In early 2011, the parties filed cross-motions for summary judgment.  In a detailed opinion, the district court: (1) granted summary judgment for all of the defendants as to plaintiffs' claims for conversion, formation of a constructive trust, breach of fiduciary duty, and request for an accounting; (2) granted summary judgment for three entity defendants and four individual defendants on the plaintiffs' breach-of-contract claims, thereby dismissing them from the case entirely; (3) granted summary judgment for the plaintiffs on all of the entity defendants' counterclaims; and (4) ruled that the remaining defendants will be judicially estopped from arguing that the plaintiffs did not perform their contractual obligations under the non-disclosure agreements. *Williamson v. Recovery Ltd. P'ship*, No. 2:06–CV–292, 2011 WL 2181813, at *32 (S.D. Ohio June 3, 2011).  The remaining entity defendants gave timely notice of interlocutory appeal of the grant of summary judgment on their counterclaims.  This appeal is before us as case number 11-3723.

After the entity defendants filed their initial appeal, the plaintiffs moved for prejudgment attachment to certain assets belonging to Columbus Exploration and Thompson ("the injunction defendants"), as well as a preliminary injunction to prevent both parties from divesting themselves of property that could be used to fulfill a judgment against them.  The plaintiffs filed their motion after Columbus Exploration allegedly thwarted a state receivership action by filing a sham bankruptcy petition, which it withdrew several weeks later.  In light of this, the plaintiffs sought a security interest in the $250,000 corpus of a severance trust established for the benefit of Thompson, in 500 commemorative gold restrike coins, and in other artifacts recovered from the *Central America*.

The location of the severance-trust corpus and the gold restrike coins was initially unknown to the plaintiffs.  During the course of litigating the preliminary-injunction motion, it was discovered that both had gone missing.  Over an objection to

the court's jurisdiction to entertain the motion, the district court: (1) gave the plaintiffs a prejudgment interest in seven crates of artifacts stored in a warehouse in Columbus, Ohio; (2) enjoined Thompson from transferring or selling any portion of the gold restrike coins or the severance-trust *res* in his possession or his residence in Vero Beach, Florida; and (3) enjoined Columbus Exploration from transferring or selling any assets that could be used to satisfy a judgment against it, other than those necessary in the ordinary course of its business.  The district court further ordered Thompson to explain what happened to the severance-trust corpus and the gold restrike coins.  When he failed to comply with a subsequent order to appear in person before the court, the judge issued a bench warrant for Thompson's arrest.  He remains at large today.  Through counsel, Thompson and Columbus Exploration took an interlocutory appeal of the injunction order, which is currently before the panel as case no. 12-3949.

II

Neither of the orders appealed is final, and this matter accordingly falls outside our jurisdiction to hear appeals from final orders of the district court.  *See* 28 U.S.C. § 1291.  The plaintiffs do not contest our jurisdiction to hear the appeal of the salvage time bar and the preliminary injunction.  They do, however, assert that we lack jurisdiction to hear the entity defendants' appeal of the summary adjudication of their counterclaims and the injunction defendants' prejudgment-attachment order.  The entity defendants cite as a jurisdictional basis for the summary-judgment appeal 28 U.S.C. § 1292(a)(3), which gives us authority to hear appeals of "[i]nterlocutory decrees . . . determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed."  For the order of prejudgment attachment, the injunction-defendants claim that the order had the "practical effect" of a preliminary injunction, and that we thus have jurisdiction under § 1292(a)(1).

A

We have not had a prior opportunity to speak authoritatively on 28 U.S.C. § 1292(a)(3).  The plain language of the statute announces a rather broad exception to the final-judgment rule—the term "admiralty cases" appears to sweep up any claim

presented in a case in which admiralty jurisdiction has been invoked. The entity defendants argue the same, citing *Roco Carriers, Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292 (2d Cir. 1990). In that case, the Second Circuit allowed Aid Export, a land-based transportation company brought into federal court on a claim pendent to a maritime-shipping suit, to bring an immediate appeal under of § 1292(a)(3) of a grant of summary judgment against it on a state-law conversion claim. *Id.* at 1297. Citing the use of the word "cases," as opposed to "claims," the Second Circuit held that § 1292(a) allowed the state-law defendant to bring an interlocutory appeal simply because its claim was part of a broader suit in admiralty. *Ibid.*

Such a reading gives us pause, however, as it would render the final-judgment rule a nullity in admiralty cases. The Supreme Court has cautioned lower courts to construe exceptions to § 1291 narrowly, so as not to "swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). Furthermore, it is widely accepted that Congress passed § 1292(a)(3) with the peculiarities of maritime litigation in mind:

> In admiralty, trials were traditionally bifurcated. First, there would be a trial before the court on the issue of liability. If there was a finding of liability, there would then be a separate hearing before a special master to ascertain damages. These damages hearings were often both lengthy and costly. Congress intended 28 U.S.C. § 1292(a)(3) to permit parties to appeal the finding of liability on the merits, before undergoing the long, burdensome, and perhaps unnecessary damages proceeding. Section 1292(a)(3) was not intended to clutter the federal docket with interlocutory odds and ends.

*City of Fort Madison v. Emerald Lady*, 990 F.2d 1086, 1089 (8th Cir. 1993) (citations and internal quotation marks omitted). In light of this, the majority of our sister circuits have eschewed the reading adopted by *Roco Carriers* for a narrower interpretation that looks to the nature of each individual claim involved in the interlocutory appeal, as opposed to the nature of the broader suit. *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 664 (7th Cir. 1998); *Evergreen Int'l Corp. v. Standard Warehouse*, 33 F.3d 420,

424–25 (4th Cir. 1994); *City of Fort Madison v. Emerald Lady*, 990 F.2d 1086, 1089 (8th Cir. 1993); *Bodden v. Osgood*, 879 F.2d 184, 186–87 (5th Cir. 1989).

Though the majority's interpretation is not without force, we cannot accept this reading of § 1292(a)(3). Contextual exegesis notwithstanding, it is axiomatic that the clearest evidence of congressional intent is the plain language of statute itself. Where the text is plain and unambiguous, we must apply a statute according to its terms. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). Section § 1292(a)(3) allows for interlocutory appeal of decrees "determining the rights and liabilities of the parties to admiralty cases." There is no ambiguity in Congress's word choice, and we thus cannot adopt a reading that would effectively strike out the word "cases" and replace it with the word "claims." *See Roco Carriers*, 899 F.2d at 1297.

This plain-text reading is bolstered by Rule 9(h)(2) of the Federal Rules of Civil Procedure, which states: "A case that includes an admiralty or maritime claim within this subdivision (h) is an admiralty case within 28 U.S.C. §1292(a)(3)." Neither party cited this highly relevant provision or the compelling notes to Rule 9 from the 1997 Advisory Committee, which specifically and clearly address the issue before us:

> A single case can include both admiralty or maritime claims and nonadmiralty claims or parties. This combination reveals an ambiguity in the statement in present Rule 9(h) that an admiralty "claim" is an admiralty "case." An order "determining the rights and liabilities of the parties" within the meaning of §1292(a)(3) may resolve only a nonadmiralty claim, or may simultaneously resolve interdependent admiralty and nonadmiralty claims. Can appeal be taken as to the nonadmiralty matter, because it is part of a case that includes an admiralty claim, or is appeal limited to the admiralty claim?
> The courts of appeals have not achieved full uniformity in applying the §1292(a)(3) requirement that an order "determin[e] the rights and liabilities of the parties." It is common to assert that the statute should be construed narrowly, under the general policy that exceptions to the final judgment rule should be construed narrowly. This policy would suggest that the ambiguity should be resolved by limiting the interlocutory appeal right to orders that determine the rights and liabilities of the parties to an admiralty claim.
> A broader view is chosen by this amendment for two reasons. The statute applies to admiralty "cases," and may itself provide for

appeal from an order that disposes of a nonadmiralty claim that is joined in a single case with an admiralty claim. Although a rule of court may help to clarify and implement a statutory grant of jurisdiction, the line is not always clear between permissible implementation and impermissible withdrawal of jurisdiction. In addition, so long as an order truly disposes of the rights and liabilities of the parties within the meaning of §1292(a)(3), it may prove important to permit appeal as to the nonadmiralty claim. Disposition of the nonadmiralty claim, for example, may make it unnecessary to consider the admiralty claim and have the same effect on the case and parties as disposition of the admiralty claim. Or the admiralty and nonadmiralty claims may be interdependent. An illustration is provided by *Roco Carriers, Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292 (2d Cir. 1990). Claims for losses of ocean shipments were made against two defendants, one subject to admiralty jurisdiction and the other not. Summary judgment was granted in favor of the admiralty defendant and against the nonadmiralty defendant. The nonadmiralty defendant's appeal was accepted, with the explanation that the determination of its liability was "integrally linked with the determination of non-liability" of the admiralty defendant, and that "section 1292(a)(3) is not limited to admiralty claims; instead, it refers to admiralty cases." 899 F.2d at 1297. The advantages of permitting appeal by the nonadmiralty defendant would be particularly clear if the plaintiff had appealed the summary judgment in favor of the admiralty defendant.

The parties do not dispute that Rule 9(h) has been properly invoked in this case—indeed, the plaintiffs argued this very point in the district court when they successfully challenged the defendants' attempt to force a jury trial. While the plaintiffs do argue that § 1292(a)(3) applies only when the appellant has pled admiralty as the jurisdictional basis for the issues raised on appeal, such a requirement is without basis in either the text of the statute or the text of Rule 9.

The entity defendants claim that the only issue remaining for trial is the calculation of damages. The plaintiffs do not contest this, and our review of the record has revealed nothing to the contrary. Because the case before the court is an admiralty case under Rule 9(h) and because the district court's summary-judgment order determined the rights and liabilities of the parties, we hold that the order is amenable to interlocutory review under § 1292(a)(3) and we will thus address the merits of the entity defendants' appeal in their entirety.

B

We next turn to the injunction defendants' appeal of the order of prejudgment attachment and preliminary injunction. The principles to be applied here are relatively straightforward. To the extent that the district court issued a preliminary injunction, we have jurisdiction to review the order. 28 U.S.C. § 1292(a)(1). To the extent that it granted prejudgment security under the laws of Ohio, via Rule 64 of the Federal Rules of Civil Procedure, we lack jurisdiction to hear an immediate appeal. 15A Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 3914.2 (West 2013) ("For many years it has been safe to say that generally appeal can be taken from orders that deny security but cannot be taken from orders that grant security."); *see also Hitachi Zosen Clearing, Inc. v. Tek–Matik, Inc.*, 846 F.2d 27, 28–29 (6th Cir. 1988).

According to its order of July 18, 2012, the district court granted the following pretrial relief:

> 1. The Court orders the attachment of seven (7) crates (or more) of artifacts warehoused on Joyce Avenue, Columbus, Ohio, and owned by Columbus Exploration LLC or any other Defendant Entity. These creates are not to be moved, encumbered or sold without further order of this Court.
> 2. The court issues a preliminary injunction against Thomas G. Thompson with regard to the five hundred (500) re-strike or commemorative gold coins transferred to him by Columbus Exploration, LLC. . . . [H]e shall not sell, encumber, transfer or diminish in value such coins. . . .
>  . . .
> 3. The Court issues a preliminary injunction against Thomas G. Thompson related to the Termination Trust. In the event that the funds received by Thompson from the Termination Trust are still in his possession, such funds are restrained from any transfer or dissipation of any kind subject to further order of this Court. . . .
> 4. The Court issues a preliminary injunction against Thomas G. Thompson regarding his house located at 135 9th Avenue, Vero Beach, Florida 32962. Thompson shall not sell, encumber, transfer or diminish the value of that real proper[t]y without further order of this Court.
> 5. The Court issues a preliminary injunction against the Defendant entities prohibiting them from making any transfer of assets beyond those within the normal or ordinary course of business for such

recurring expenses as are anticipated.  Any other transfers require further approval of this Court after notice and hearing.

In large part, the district court ordered injunctive relief, reviewable under § 1292(a)(1).  The litigants disagree, however, on whether we may review the order insofar as it relates to the crates of artifacts warehoused in Columbus.

On first blush, it would appear that the plaintiffs are correct that we lack jurisdiction.  The relief is styled as an "attachment" and granted under Ohio Revised Code § 2715, the section of the state code devoted exclusively to attachment to property. The injunction defendants counter that we must treat the putative attachment order as an injunction because it forbids encumbrance or disposal of the property, giving it the practical effect of an injunction.  They correctly note that, for the purposes of determining our jurisdiction under § 1292(a)(1), we look past the labels used by the trial court and to the "nature of the order and the substance of the proceeding below to determine whether the rationale for denying appeal applies."  *N.E. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1005 (6th Cir. 2006).  Orders that have the practical effect of an injunction are subject to interlocutory appeal under § 1292(a)(1) "only if the order has a 'serious, perhaps irreparable, consequence' and the order can be 'effectively challenged' only by means of an immediate appeal."  *Booher v. N. Ky. Univ. Bd. of Regents*, 163 F.3d 395, 397 (6th Cir. 1998) (quoting *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981)).

Even if we were to assume that this portion of the order had the practical effect of an injunction, the injunction defendants do not explain how the order results in serious harm to them or why interlocutory appeal is the only avenue of relief available to them. Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited.  *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006). Additionally, it is clear from the record that the district court sought to make the order as minimally invasive as possible, stating that though it was specifically ordering the artifacts to "stay put," the court would timely consider, and be inclined to grant, any reasonable request to make use of the artifacts.  We see no serious or irreparable

consequence flowing from the attachment order, regardless of whether it had an injunctive element to it, and we therefore decline to entertain these issues under § 1292(a)(1).

## III

Having determined our jurisdiction, we now turn to a complex procedural issue. The entity defendants argue that the entirety of the plaintiffs' case is time barred under 46 U.S.C. § 80107(c):

> A civil action to recover remuneration for giving aid or salvage services must be brought within 2 years after the date the aid or salvage services were given, unless the court in which the action is brought is satisfied that during that 2-year period there had not been a reasonable opportunity to seize the aided or salvaged vessel within the jurisdiction of the court or within the territorial waters of the country of the plaintiff's residence or principal place of business.

According to the entity defendants, the plaintiffs provided services to assist in the salvage of the *Central America* and, by the plain text of the statute, their suit for compensation is subject to a two-year statute of limitation. The entity defendants urge a broad reading of the statute, citing in support the words immediately preceding "salvage services"—"[a] civil action to recover remuneration." The plaintiffs claim that this is not a salvage action and they do not seek a salvage award. Rather, they assert that this is a simple maritime-contract dispute: they complied with the non-disclosure agreements by holding Thompson's works in confidence, but he did not pay according to the terms of the contract.

To be sure, salvage actions have long presented numerous complexities for the federal courts. Add to this the factual peculiarities of a recovery operation for treasures long, and assumed forever, lost at the bottom of the ocean, and even the most seasoned jurist can find himself navigating uncharted waters. We may resolve this issue, however, by noticing two basic points. First, the plaintiffs are not suing on their employment contracts. Rather, they are suing on their non-disclosure agreements, in which they exchanged confidentiality for a percentage of the net recovery from the *Central America*.

Under no conceivable definition of the term may such a contract be deemed an agreement to provide "salvage services."

Second, to the extent that the entity defendants would have us consider the broader nature of the plaintiffs' job descriptions, it is a fundamental principle of admiralty that one who provides services pursuant to a contract of employment may not be considered a "pure" salvor. Contract salvors are not entitled to a number of special protections afforded to pure salvors, including the right to a salvage award and the right to seize a vessel pending payment. Reading the limitations provision in context with the remainder of the statute, which includes a tolling provision for those who have been unable to arrest the aided or salved vessel, § 80107(c) applies only to pure salvors. Accordingly, the limitations provision cannot apply to the plaintiffs.

A

The term "salvage services" is not defined in Title 46. However, the term "salvage" has a long-accepted definition within the law of admiralty:

> Salvage is well defined as the compensation allowed to persons by whose assistance a ship or vessel, or the cargo of the same, or the lives of the persons belonging to the ship or vessel, are saved from danger or loss in cases of shipwreck, derelict capture, or other marine misadventures.
> Other jurists define it as the service which volunteer adventurers spontaneously render to the owners, in the recovery of property from loss or damage at sea under the responsibility of making restitution and with a lien for their reward.
> Persons who render such service are called salvors, and a salvor is defined to be a person who, without any particular relation to the ship in distress, proffers useful service and gives it as a volunteer adventurer without any pre-existing contract that connected him with the duty of employing himself for the preservation of the vessel.
> Enough appears in those definitions to show that the elements necessary to constitute a valid salvage claim are as follows: (1.) A marine peril to the property to be rescued. (2.) Voluntary service not owed to the property as matter of duty. (3.) Success in saving the property or some portion of it from the impending peril.

*The Clarita and the Clara*, 90 U.S. (23 Wall.) 1, 16 (1874) (footnotes omitted).

We may glean from this definition a simple, yet fundamental, characteristic of a salvage action: the assistance provided must be on a volunteer basis, that is, provided without expectation of compensation under a pre-existing agreement.  Volunteer, or "pure," salvors hold special place in maritime law that is "utterly at variance with terrene common law.*"* 3A *Benedict on Admiralty* § 1 (Lexis 2013).  Two unique entitlements of a pure salvor are the right to a liberal salvage award, typically in excess of the *quantum meruit* of the service provided, *The Blackwall*, 77 U.S. (10 Wall.) 1, 13–14 (1870), and the right to obtain a lien upon and arrest the aided or salved vessel, *The Sabine*, 101 U.S. 384, 386 (1880).

If, however, the services for which the plaintiff seeks payment are due within the scope of a valid contract, he is not entitled to an award as a pure salvor.  *See The Camanche*, 75 U.S. (8 Wall.) 448, 477 (1869); *accord Solana v. GSF Dev. Driller I*, 587 F.3d 266, 271 (5th Cir. 2009); *Flagship Marine Servs., Inc. v. Belcher Towing Co.*, 966 F.2d 602, 605 (11th Cir. 1992).  Though the mere existence of an agreement to provide a given type of service will not necessarily defeat a claim for a pure salvage award, *Fort Myers Shell & Dredging Co. v. Barge NBC 512*, 404 F.2d 137, 139 (5th Cir. 1968), "a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." *The Camanche*, 75 U.S. (8 Wall.) at 477.  Loss of status as a pure salvor strips a plaintiff not only of his right to a salvage award, but also of his ability to seize the aided or salved vessel through a salvage lien.  3A *Benedict on Admiralty* § 159.

B

At the outset, it is questionable whether the plaintiffs are salvors of any kind vis-à-vis the entity defendants.  The plaintiffs are not seeking compensation for any act that may even colorably be called salvage.  Indeed, the *quid* for which they now seek the promised *quo* is no affirmative act at all—it is silence.  The entity defendants ignore that the plaintiffs' breach-of-contract claims are predicated on an alleged breach of the non-disclosure agreements, in which the parties exchanged promises of confidentiality for

a percentage of the net recovery from the *Central America*. The entity defendants make no attempt to argue that the confidence held pursuant to the non-disclosure agreements constitutes "salvage services." As the previous discussion of "salvage" illuminates, this is with good reason: it would strain all credulity to accept that one who maintains secrecy of his employer's works and writings is the same as one who "assist[s]a ship or vessel, or the cargo of the same, or the lives of the persons belonging to the ship or vessel," thereby saving them "from danger or loss in cases of shipwreck, derelict capture, or other marine misadventures." *See The Clarita and the Clara*, 90 U.S. (23 Wall.) at 16.

The entity defendants' briefing ignores the plain distinction between the compensation due under the employment contract and the compensation due under the non-disclosure agreements, asserting that the plaintiffs' claims "arise from their having provided services in the salvage of the *SS Central America*." Appellant's Br. 34. They seemingly invite us to judge the nature of the plaintiffs' claims based upon the broader context of the recovery operation. Even if we did, their argument would still fail. It is beyond debate that, to the extent that the plaintiffs provided any salvage services, they did so pursuant to pre-arranged agreements. Accordingly, they cannot be pure salvors. The question thus becomes whether the term "salvage services," as used in § 80107(c), refers solely to acts of pure salvage or includes acts of contractual salvage.

Though § 80107(c) does not define the term, and a precise definition of the term is not readily apparent, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Greenbaum v. EPA*, 370 F.3d 527, 535 (6th Cir. 2004) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000)). The subordinate clause at the end of subsection (c) gives courts discretion to toll the two-year statute of limitations if "during that 2-year period there had not been a reasonable opportunity to seize the aided or salvaged vessel . . . ." Of course, a prejudgment lien on an aided or salved vessel is a privilege enjoyed specifically by pure salvors. *See The Sabine*, 101 U.S. at 386 ("Salvors, under the maritime law, have a lien upon the property

saved . . . . Such a remedy is the one usually pursued, and in view of the fact that the lien is maritime and exists quite independently of possession, it ordinarily affords the best mode of securing the payment of their salvage claims."). It would be exceedingly odd for Congress to have intended to bring both pure and contract salvors within the ambit § 80107(c)'s statute of limitation, and then, without providing any textual delineation, create a tolling provision that is relevant to only one of the two categories of salvors. The more sensible reading of the statute is that it applies only to the group of salvors to whom the entirety of the statute speaks—pure salvors. Accordingly, § 80107(c) cannot apply to the plaintiffs.

IV

The district court granted summary judgment against all three of the entity defendants' counterclaims. The court found that the evidence submitted by the entity defendants was either vague or irrelevant, and thus could not establish the elements of any of the counterclaims, even when viewed in a favorable light. We affirm that decision.

We review the district court's grant of summary judgment *de novo*. *Trs. of the Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 590 (6th Cir. 2000). The decision below may be affirmed only if the pleadings, affidavits, and other submissions show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, we draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The counterclaims are interlinked. The entity defendants claim that the plaintiffs breached their non-disclosure agreements and then conspired to file frivolous suits across the country, all alleging that the defendants were in fact the breaching party, as a means of frustrating business with the California Gold Marketing Group. The breach-of-contract counterclaim is the foundation upon which the civil-conspiracy and unfair-

competition counterclaims are built. If the breach-of-contract counterclaim does not survive summary judgment, then the remaining counterclaims are doomed as well.

As they did in the court below, the entity defendants refer us to two sets of documents to substantiate their counterclaims: declarations from their attorneys, Robert Robol and David Douglas; and an affidavit from plaintiff Timothy McGinnis, with two attached newspaper articles in which he is quoted discussing his work on the recovery of the *S.S. Central America*. The declarations from the two attorneys contain no evidence relevant to any of the entity defendants' counterclaims. Rather, they are oriented towards refuting the testimony of one of the plaintiffs' witnesses, James Shirley, a retired attorney who represented some of the plaintiffs early on in the litigation and upon whom the plaintiffs rely to introduce documents tending to prove their entitlement to compensation under the non-disclosure agreements.

The statements from McGinnis's affidavit are quotations from two newspaper articles appearing in the *Seattle Times*. In the first of these articles, McGinnis broadly discusses how the deep-sea-sonar scan worked. The second article states that "McGinnis has collected everything he could about the *U.S. Central America* [sic]" and that he has "17-year-old records and folded handwritten notes about the sunken ship" that he intends to pass on to his children. The newspaper clippings confirm the same.

Nothing in McGinnis's affidavit establishes any element of any of the counterclaims against any of the other plaintiffs. To the extent that the entity defendants offer the affidavit and the attached articles as proof that McGinnis himself breached his non-disclosure agreement, this represents nothing more than a scintilla of evidence. *See Hirsch v. CSX Trans., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). McGinnis's statements are highly generalized in nature and give no indication as to the substance of the documents in his possession. While it is not outside the realm of possibility that some of the documents are covered by the non-disclosure agreement, it is equally possible that they are nothing more than his personal, handwritten reflections on the adventures.

Without any evidence of the subject matter of these documents in the record, no reasonable factfinder could conclude that McGinnis violated his agreement without

engaging in a large degree of impermissible speculation. *See* Fed. R. Evid. 602. Accordingly, the plaintiffs are entitled to summary judgment on the entity defendants' breach-of-contract claim.    Because the civil-conspiracy and unfair-competition counterclaims are predicated on the breach-of-contract counterclaim—and because both are wholly unsubstantiated by the record before us—the plaintiffs are entitled to summary judgment on those issues as well.

V

Finally, the injunction defendants, Thompson and Columbus Exploration, raise a plethora of issues with the district court's injunction order.  They challenge the district court's jurisdiction to entertain the preliminary-injunction motion, its authority in equity to grant a preliminary injunction, and the proper exercise of the court's discretion in granting the injunction.  They further assert that the $500 bond set by the district court was unconstitutionally low.  We reject all of these arguments and affirm the district court.

A

1

The injunction defendants' first two arguments go to the district court's jurisdiction to entertain the plaintiffs' motion for a preliminary injunction and its authority in equity to issue the injunction.  They first argue that the Supreme Court's decision in *Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, 527 U.S. 308 (1999), prohibits the issuance of a preliminary injunction on the sale or transfer of assets absent a claim in equity or a valid judgment on which the plaintiff seeks to execute.  While the holding of *Grupo Mexicano* provides a colorable basis for the merits of their argument, *id.* at 333, the injunction defendants run into a more basic problem—forfeiture.

Curiously, the injunction defendants seemingly frame the issue before this court as a jurisdictional argument.  Appellant's Br. 20 ("[T]he Trial Court did not have jurisdiction in equity to issue a preliminary injunction.").  To the extent that they intended to do so, they are several centuries too late in making this argument.  *See*

Judiciary Act of 1789, 1 Stat. 74, 78 (vesting district courts with jurisdiction over "all suits of a civil nature at common law or in equity"). Perhaps the explanation for this odd presentation lies in the manner in which the injunction defendants presented their arguments in the court below. They spent a great deal of time arguing that the district court was deprived of jurisdiction to entertain the preliminary-injunction motion due to the entity defendants' interlocutory appeal. However, they do not once suggest that, jurisdiction notwithstanding, the district court lacked *authority* to grant the equitable remedy of a preliminary injunction in order to protect a future potential remedy at law. This latter point is the crux of *Grupo Mexicano*, *see* 527 U.S. at 333 ("Because such a remedy was historically unavailable from a court of equity, we hold that the District Court had no *authority* to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." (emphasis added)); yet they do not even once cite the opinion, let alone present the argument, in their pleadings below. Accordingly, their argument is forfeited before this court. *Jolivette v. Husted*, 694 F.3d 760, 770 (6th Cir. 2012) ("As a rule, we will not review issues if they are raised for the first time on appeal.").

2

The injunction defendants also argue that the district court was stripped of jurisdiction to entertain the preliminary-injunction motion when the entity defendants took an interlocutory appeal to this court. "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982); *see also United States v. Garcia–Robles*, 562 F.3d 763, 767–68 (6th Cir. 2009). This transfer of power, however, does not effect a total divestiture of jurisdiction from the district court: it retains jurisdiction to enforce its judgment, *City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 394 (6th Cir. 2007), to proceed with matters that will aid the appellate process, *Cochran v. Birkel*, 651 F.2d 1219, 1221 (6th Cir. 1981), and to adjudicate matters unrelated to the issues on appeal, *Weaver v. Univ. of*

*Cincinnati*, 970 F.2d 1523, 1528–29 (6th Cir. 1992).  In *Weaver*, in particular, we held that "an appeal from an interlocutory order does not divest the trial court of jurisdiction to continue deciding other issues involved in the case."  970 F.2d at 1528–29.

The preliminary injunction here is one of those "other issues" over which the trial court retains jurisdiction.  The plaintiffs moved for the injunction upon information that Columbus Exploration was approaching insolvency.  The plaintiffs' desire for security is particularly understandable in light of the fact that the plaintiffs had information suggesting that Columbus Exploration was abusing the federal bankruptcy courts to evade a state receivership action.

The injunction defendants assert that the injunction is inextricably intertwined with their interlocutory appeal.  However, it is a basic legal principle that the right and the remedy are two analytically distinct aspects of a suit.  *Cf. Davis v. Passman*, 441 U.S. 228, 239 (1979) ("[T]he question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive.").  Even if we accept *arguendo* the injunction defendants' assertion that their appeal may negate the plaintiffs' entitlement to a remedy by disproving their cause of action, the plaintiffs' efforts to ensure that a remedy may still be had if they prevail on appeal does not affect the merits of the defendants' appellate argument against the cause of action.  We therefore affirm the district court's jurisdiction to entertain the request for a preliminary injunction.

B

We next move to the substance of the preliminary injunction.  When considering a motion for a preliminary injunction, the district court must consider and balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004).  We review the district court's overall decision to grant the injunction for an

abuse of discretion, deferring to its fact finding under a clear-error standard and reviewing its decisions of law *de novo*.  *Ibid.*

The injunction defendants claim that the district court erred as a matter of law in its analysis of the first, second, and fourth factors.  Scrutiny of their argument reveals, however, that all of their complaints against the district court's ruling relate to its fact finding and general balancing of the factors.  We must therefore give deference to the district court in our analysis of each of the defendants' arguments.

They first claim that the district court erred in finding that the plaintiffs had a substantial likelihood of success on the merits of their breach-of-contract claims.  The district court previously held that all of the defendants are judicially estopped from claiming that the plaintiffs did not fulfill the terms of their non-disclosure agreements, as the defendants previously claimed in the initial round of litigation in the Fourth Circuit that their salvage award should take into account the money they will have to pay the plaintiffs pursuant to their non-disclosure agreements.  *Williamson*, 2011 WL 2181813, at *24–25.  Accordingly, the district court focused its injunction analysis on whether the plaintiffs had a substantial likelihood of showing a net recovery from the salvage operation, thus triggering the plaintiffs' contractual entitlements to a share of the profits.  The court found a substantial likelihood of successfully proving profits by referring to data produced during an external audit of Recovery Limited and Columbus Exploration.  The data revealed that Thompson and a number of outsiders, many of whom with a lower payment priority than the defendants, had received substantial sums of money despite repeated representations to the plaintiffs that no one had yet been paid.  The injunction defendants offer no evidence demonstrating that the district court clearly erred in this determination.

The injunction defendants next charge that the court abused its discretion in finding that Columbus Exploration's precarious financial situation demonstrated that the plaintiffs would suffer irreparable harm without the injunction.  They claim that, regardless of Columbus Exploration's financial situation, the equitable remedy of an injunction is inappropriate in a situation such as this, where the ultimate remedy sought

by the plaintiffs is a remedy in law compensable with money.  To a substantial degree, this is a repackaging of the defendants' forfeited *Grupo Mexicano* argument.  It is sufficient to note, however, that the majority in *Grupo Mexicano* specifically reserved the question of whether an injunction to protect a legal remedy would be appropriate in cases where the defendants have engaged in fraudulent behavior, 527 U.S. at 325 n.7, and a number of our sister circuits have interpreted *Grupo Mexicano* to "exempt[] from its proscription against preliminary injunctions freezing assets cases involving . . . fraudulent conveyances." *Iantosca v. Step Plan Servs., Inc.*, 604 F.3d 24, 33 (1st Cir. 2010) (internal quotation marks omitted); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083–84 (9th Cir. 2009); *Animale Grp., Inc. v. Sunny's Perfume, Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007); *Kennedy Bldg. Assocs. v. CBS Corp.*, 476 F.3d 530, 535 (8th Cir. 2007).  We agree and join our sister circuits.

The district court was well within its sound discretion to grant an injunction in this case.  Indeed, the genesis of the motion for a preliminary injunction was a bankruptcy filing by Columbus Exploration that reeked of fraud.  We further note that a panel of this circuit has previously upheld a substantial sanction against Columbus Exploration, Thompson, and others for their bad-faith failure to comply with a court-ordered audit.  *See generally Williamson v. Recovery Ltd. P'ship*, 467 F. App'x 382 (6th Cir. 2012).  The aforementioned audit itself, as referenced by the district court, suggests that Columbus Exploration engaged in a number of accounting irregularities and questionable financial transactions.  And, though it occurred after the issuance of the injunction, it is a rather damning indictment of the defendants' behavior that one of the parties to this very issue, Thomas Thompson, is presently a wanted fugitive for his behavior during the course of this litigation.[6]

The injunction defendants also contend that the district court erred in finding that the public interest would be served by issuing the injunction.  By the district court's own statment, the public-interest factor did not weigh heavily in the plaintiffs' favor.  But

---

[6]Though we decline to exercise our discretion to dismiss Thompson's appeal *sua sponte* under the fugitive-disentitlement doctrine, his flagrant contempt may well serve as a basis for this court and the district court to deny him future access to judicial process, unless and until he turns himself in.

neither did it weigh against them.  The injunction defendants' analysis of this factor consists of yet another block quote from *Grupo Mexicano*.  Appellant's Br. 39.  Their cursory analysis fails to demonstrate that the district court abused its discretion in assessing this element or in its overall decision to grant the injunction.  We therefore affirm the district court.

C

As a final matter, the injunction defendants assert that the district court abused its discretion by setting a $500 bond for the preliminary injunction.  The district court, however, did not set the bond for the preliminary injunction.  It set the bond for the prejudgment attachment on the crates of artifacts.  As discussed earlier, the injunction defendants have not demonstrated how the order results in serious or irreparable consequence to them, and we therefore do not have jurisdiction to entertain arguments on this issue.  Furthermore, the district court explained that it chose to set this lower bond amount because it was leaving the crates in the possession of the defendants and allowing them wide latitude to move the court for permission to use the artifacts.  This decision strikes us as eminently reasonable.

VI

For the foregoing reasons, we **AFFIRM** the judgments of the district court, except as to its order of prejudgment attachment of certain artifacts, as to which we lack jurisdiction to entertain the appeal.