RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MICHAEL WILLIAMSON, et al.,

*Plaintiffs,*

DISPATCH PRINTING COMPANY,

*Plaintiff-Appellee,*

No. 14-4231

*v.*

RECOVERY LIMITED PARTNERSHIP, et al.,

*Defendants,*

RICHARD THOMAS ROBOL,

*Movant-Appellant.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus
No. 2:06-cv-00292—Algenon L. Marbley, District Judge.

Argued:  April 27, 2016

Decided and Filed:  June 10, 2016

Before:  BOGGS and SUHRHEINRICH, Circuit Judges; and MURPHY, District Judge.[*]

---

**COUNSEL**

**ARGUED:**  Jason D. Winter, REMINGER CO., LPA, Cleveland, Ohio, for Appellant.  Steven Walter Tigges, ZEIGER, TIGGES & LITTLE LLP, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Jason D. Winter, Holly Marie Wilson, REMINGER CO., LPA, Cleveland, Ohio, Richard T. Robol, ROBOL LAW OFFICE, LLC, Columbus, Ohio, for Appellant.  Steven Walter Tigges, Bradley T. Ferrell, ZEIGER, TIGGES & LITTLE LLP, Columbus, Ohio, for Appellee.

---

[*]The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

---

**OPINION**

---

BOGGS, Circuit Judge.  This appeal involves yet another skirmish in the legal battle over the treasure from the *S.S. Central America*, the history of which was recounted in an earlier decision by this panel in *Williamson v. Recovery Ltd. Partnership (Williamson II)*, 731 F.3d 608 (6th Cir. 2013).  In this case, we review the district court's imposition of sanctions against the defendants' attorney, Richard Robol, for hampering the enforcement of a court order in bad faith.  For the reasons discussed below, we affirm.

## I.  Background

On July 20, 2006, the United States District Court for the Southern District of Ohio adopted a consent order intended to resolve a suit by Dispatch Printing Company (Dispatch) against Recovery Limited Partnership (RLP) and Columbus Exploration, LLC (CX) for an accounting of the gold from the *S.S. Central America* shipwreck.  Paragraph 3 of the consent order provided that:  "Within sixty (60) days after entry of this Order, Defendants shall provide Plaintiffs' accountant . . . with full access and opportunity to review the documents and materials regarding the period from January 1, 2000 through the date of entry of this Order, identified in the July 11, 2006 list by Accountant, for the purpose of preparing a report . . . of the financial affairs and condition of CX and RLP."

On December 5, 2006, the district court issued a contempt order against the defendants based on a number of grounds, one of which was their failure to turn over "an inventory of the gold recovered and sold."  Without an inventory of the gold that the defendants recovered and sold, it was "inconceivable that any degree of thorough auditing could commence."  The district court went on to remark:

> The Court is troubled by the Defendants' position regarding documents relating to the sale of gold.  While counsel for the Defendants represented to the Court that the documents could not be located, no testimony was presented in support of such contention.  Further, the Court is deeply skeptical of the Defendants' claim that such critically important documents could not be located.  Moreover, following the hearing conducted in this case, and prior to the issuance of this

Order, the Defendants have filed a Motion asking the Court to review *in camera* records relating to the sale of the gold. Such documents were required to be turned over by the Defendants to Plaintiffs' accountant within sixty days of the Order issued by this Court on July 20, 2006. The Defendants presented no evidence regarding any efforts made to locate such documents, or explaining how such documents were not in the possession of the Defendants. The recent Motion [filed by the defendants] asks for an *in camera* inspection of documents originally claimed to be lost, leading this Court to find a total lack of good faith of at least CX and RLP in compliance with the July 20, 2006 Order.

Paragraph 2 of the contempt order, as later amended, provided that the "Defendants shall tender to the Plaintiffs' accountant an inventory of the gold." The court also stated that the "record in this case shall be kept open regarding this violation," and that the "Court reserves for a later date sanctions or other remedies with regard to such violations."

In response to the contempt order, the defendants turned over an inventory of the gold that they sold to the California Gold Marketing Group from February 15 to September 1, 2000. They did not, however, turn over any prior inventories, which would have provided a complete accounting of the treasure recovered from the ship. Unsatisfied with the defendants' efforts to comply with numerous provisions of the consent order, even after the contempt order, Dispatch filed another motion to hold the defendants in contempt on March 9, 2007.

At the contempt hearing on April 24, 2007, Dispatch's attorney, Steven Tigges, and the defendants' attorney, Richard Robol, argued about whether the defendants possessed any inventories that predated the sale to California Gold:

> Mr. Tigges: Secondly, Your Honor, your order from July 20 of 2006 was very clear. They are to produce documents regarding the period from January 1, 2000. A document may be [produced] prior to that date regarding [treasure sold during] that period.
>
> The Court: I am familiar with the dispute.
>
> Mr. Tigges: An inventory of assets clearly is that. . . . Your Honor will recall prior to the agreement with California Gold, these [defendant] entities had an agreement to sell the gold through Christie's. And it's inconceivable that Christie's would undertake that agreement of an advance of upwards of $30 million to these entities and not have an inventory of what they were buying. So those documents plainly exist, Your Honor.

> Mr. Robol:  May I clarify one thing?  This is not for purposes of argument.  This is for purposes of Mr. Tigges's understanding.  We have produced the inventories, even if they are pre-2000 inventories.  I don't want there to be any ambiguity in his mind about that.  We have produced all the inventories.

Thus, Robol clearly represented to the court that the defendants were not in possession of any pre-California-Gold-sale inventories.  At the close of the contempt hearing, the district court clarified the scope of its contempt order from December 2006:

> [T]he defendants shall tender to the accounting firm anything that could be construed as an inventory of any kind regarding assets recovered from the shipwreck that would have been sold during the relevant time of this audit or review.  So, in other words, if there are assets recovered in 1980 that were sold in 2001, and there is an inventory that goes with them [sic] assets, then that is to be turned over.

Although the court did not hold the defendants in contempt at that time, it issued a second contempt order against them in September 2009 for causing "significant delay and expense."  The court concluded:  "The accounting was sandbagged by the Defendants through a variety of means.  What should have taken several months has taken several years. . . . The Court finds the Defendants have willfully violated the prior Orders of this Court."  This court affirmed that decision in *Williamson v. Recovery Ltd. Partnership (Williamson I)*, 467 F. App'x 382 (6th Cir. 2012).

Throughout the years of litigation, Robol represented on multiple occasions that the California-Gold-sale inventory was the only inventory in the defendants' possession:

- At a hearing on September 7, 2007, Robol said:  "Now let me address the specifics of the inventory.  What you have been told is false, false, false.  The company has no inventories of the gold sold other than what has been provided."  Robol also stated:  "We provided the inventory that the company had.  We provided the inventory of that asset, the treasure that was sold to the California Gold Marketing Group."

- In a trial brief filed on December 3, 2008, Robol stated that the defendants "produced the only inventory in their possession in late 2006, which was the inventory of the gold items sold to the California Gold Marketing Group."

- At a hearing on December 8, 2008, Robol said:  "We produced the one and only inventory that the company had, which was the inventory relating to the sale to the party that we had spoken about, the California Gold Marketing Group."

- In an appellate brief filed with this court on March 19, 2010, in *Williamson I*, Robol stated: "The first inventory—the only inventory that Columbus Exploration had in its possession, custody or control—was provided to KPMG shortly after the December 5, 2006 Order. . . . [That] inventory listed every item of gold treasure sold to the California Gold Marketing Group." Robol reiterated that claim in a reply brief filed on June 1, 2010.

In 2013, Dispatch obtained the appointment of a receiver that it had first sought in 2008 in order "to take control of RLP and CX, dissolve them and liquidate their assets, and wind up their affairs." The receiver recovered thirty-six file cabinets containing RLP and CX records that were stored in the basement of a duplex that Robol owned and partially leased to the defendants. Within those cabinets, the receiver found numerous treasure inventories created prior to the California Gold sale that were never turned over to Dispatch. Among the inventories was a master inventory, printed on hundreds of sheets of printer paper bound in a hard cover labeled "89 & 90 COIN AND BAR MASTER COPY." That inventory was one of many inventories found in the cabinets, which in total span thousands of pages and comprise most of the seventeen-volume appendix to Dispatch's brief.

On October 16, 2013, Dispatch filed a motion asking the district court to exercise its inherent powers to sanction Robol for engaging in bad-faith conduct during the litigation. The district court conducted a three-day sanctions hearing, with testimony from numerous witnesses, and concluded that Robol engaged in sanctionable bad-faith conduct when he concealed the existence of the pre-California-Gold-sale inventories. In calculating the sanctions, the district court rejected Dispatch's initial request for $1,717,388—the entirety of its litigation expenses—and limited the sanctions to "the amount equal to the cost of pursuing this Motion for Sanctions, as well as the amount expended . . . to uncover this fraud and locate the inventories uncovered by the Receiver." Dispatch submitted bills for $249,359.85, which the district court reduced to $224,580. After the district court entered its sanctions order, Robol appealed.

## II. Standard of Review

We review the district court's exercise of its inherent power to sanction for abuse of discretion. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 510 (6th Cir. 2002). "An abuse of discretion exists if the district court based its ruling on an erroneous view

of the law or a clearly erroneous assessment of the evidence." *Ibid.* (quoting *Apostolic Pentecostal Church v. Colbert*, 169 F.3d 409, 417 (6th Cir. 1999)).

### III.  Bad Faith

#### A.  Applicable Law

The district court sanctioned Robol under its inherent powers for acting in bad faith. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991).  In coming to that conclusion, the court purported to apply Sixth Circuit precedent stating that a plaintiff can be sanctioned for advancing claims in bad faith if the court finds "[1] that the claims advanced were meritless, [2] that counsel knew or should have known this, and [3] that the motive for filing the suit was for an improper purpose." *First Bank of Marietta*, 307 F.3d at 524 (quoting *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997)).  Although we have previously described the *Big Yank* test as "a three-prong test to determine whether a district court may properly impose sanctions," *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 752 (6th Cir. 2010), that test clearly contemplates a situation in which a plaintiff has filed a frivolous lawsuit.  That test is not applicable to this case, which involves a motion for sanctions against a stonewalling attorney.

The district court also purported to apply Sixth Circuit precedent stating that a party seeking to show a fraud on the court must present clear and convincing evidence of the following elements: "1) [conduct] on the part of an officer of the court; that 2) is directed to the judicial machinery itself; 3) is intentionally false, willfully blind to the truth, or is in reckless disregard of the truth; 4) is a positive averment or a concealment when one is under a duty to disclose; and 5) deceives the court." *Johnson v. Bell*, 605 F.3d 333, 339 (6th Cir. 2010) (quoting *Carter v. Anderson*, 585 F.3d 1007, 1011 (6th Cir. 2009)).  Dispatch urges on appeal that we also apply this test.  The problem with applying this test is that the fraud-on-the-court doctrine deals with courts' inherent power to vacate their judgments, whereas this case involves a court's inherent power to sanction for misconduct in litigation.

The confusion seems to have arisen from Dispatch's argument to the district court that proving fraud on the court—as opposed to bad faith—would allow it to recover the entirety of its

litigation expenses in the case—$1,717,388. That argument was based on *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575 (1946), a case in which the Supreme Court said in dicta that, when a court properly exercises its inherent power to *vacate its judgment due to fraud*, "the entire costs of the proceedings could justly be assessed against the guilty parties." *Id.* at 580. *Universal Oil* was quoted in *Chambers* for the proposition that fraud on the court can constitute sanctionable bad-faith conduct. 501 U.S. at 43–44, 46. Based on *Chambers*'s citation to *Universal Oil*, Dispatch imported the fraud-on-the-court test—used to decide whether a judgment should be vacated—into this case involving sanctions, and the district court applied that test. Although the Supreme Court's decision in *Chambers* mentioned fraud on the court as an example of bad faith, the fraud-on-the-court doctrine is not applicable in this case because this case involves a court's inherent power to sanction.

Despite the district court's erroneous application of these legal tests, we may affirm the court's order on any ground that is supported by the record. *See Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 446 (6th Cir. 2006). In our view, the proper question is whether Robol showed "bad faith by . . . hampering [the] enforcement of a court order." *Chambers*, 501 U.S. at 46 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978)). That inquiry requires us to ask two questions: Did the party or attorney engage in conduct that hampered the enforcement of a court order? If so, did that party or attorney act in bad faith? Having clarified the appropriate legal test, we now turn to the question of whether Robol hampered the enforcement of a court order in bad faith.

## B. Analysis

In 2006, the district court entered a consent order requiring the defendants to turn over documents regarding the period from January 1, 2000, to July 20, 2006. The purpose of the consent order was to allow Dispatch's accountant, KPMG, to perform a complete accounting of the treasure and determine whether any treasure was missing. Essential to KPMG's ability to perform that accounting were the defendants' inventories of the treasure that they recovered from the *S.S. Central America*. As the district court observed in its contempt order dated December 5, 2006: "It is inconceivable that any degree of thorough auditing could commence without such documents."

By refusing to notify the court of the existence of inventories created prior to the California-Gold-sale inventory and falsely claiming that the California-Gold-sale inventory was the only inventory in the defendants' possession, Robol hampered the enforcement of the 2006 consent order. If Robol had disclosed the existence and location of the pre-California-Gold-sale inventories, Dispatch would not have been forced to wait until 2013, after years of costly litigation, to obtain the inventories. As the district court stated in its order sanctioning Robol, by "representing to this Court and the Court of Appeals, on multiple occasions, that his clients had no other inventories, or indeed that such inventories ever existed," Robol "hamper[ed] the enforcement of a court order."

The parties do not dispute that Robol's inaccurate statements hampered the enforcement of the district court's order. Instead, they focus on the question of whether Robol acted in bad faith. There is a dearth of case law explicating the meaning of bad faith in this context. For our purposes, it suffices to say that bad faith includes conduct undertaken with the intention of hampering the enforcement of a court order. In this case, the bad-faith inquiry requires us to examine whether Robol knew that the defendants possessed the undisclosed inventories or was willfully blind to their existence when he made his misrepresentations to the court. If Robol knew about the inventories or was willfully blind to their existence, then his repeated misrepresentations would not be innocent, and there would be a strong inference that Robol intentionally hampered the enforcement of the district court's order.

Dispatch points to a number of facts as evidence that Robol knew of the existence of the pre-California Gold sale inventories, the most important of which include:

*1991 Letter.* On October 28, 1991, while trying to obtain a loan from Bank One, Robol sent a letter to the CEO of Bank One enclosing a forty-three-page inventory of the treasure recovered from the *S.S. Central America*. Dispatch cites this letter as evidence that Robol knew about the existence of, and indeed at one point possessed, an earlier inventory of the treasure, which he did not disclose to the court.

*Virginia Admiralty Litigation.* Robol served as the attorney for a business entity related to RLP, Columbus-America Discovery Group, Inc., in the 1990s in a Virginia admiralty case that

dealt with the subrogation claims of insurance companies who had paid insurance claims when the *S.S. Central America* sank. *See Columbus-Am. Discovery Grp., Inc. v. Atl. Mut. Ins. Co.*, 974 F.2d 450 (4th Cir. 1992); *Columbus-Am. Discovery Grp., Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 742 F. Supp. 1327 (E.D. Va. 1990). Dispatch argues that Robol must have known of his clients' inventories through this litigation because they were an important subject of that litigation. Robol's cocounsel in the admiralty case, Rex Elliott, testified to this effect at Robol's sanctions hearing.

*Bob Evans*. Bob Evans was the employee at RLP who created and maintained its inventories. He testified at the sanctions hearing that Robol was aware that Evans's job was to create and maintain the inventories in the 1980s and 1990s. Dispatch argues that Evans's testimony shows that Robol must have known of the existence of inventories that were created prior to the creation of the California-Gold-sale inventory.

*Jim Henson*. Jim Henson is the financial advisor for the receiver who was appointed in 2013. On September 17, 2013, he attended a meeting at which Robol was present and talked to Robol about the undisclosed inventories. Henson recounted the conversation in his testimony at the sanctions hearing:

> Q: Now, shifting gears with you again, sir. After you and your team found these various inventory documents that we've been looking at, did you ever have occasion to speak to Mr. Robol about them?
>
> A: I did.
>
> Q: What were the circumstances?
>
> A: We were at a meeting at Gil Kirk's office.
>
> Q: Who is Gil Kirk?
>
> A: I'm sorry. Mr. Kirk was a former member of the board at Columbus Exploration, CX. We were at a meeting at his office on the 17th of September and the issue of the inventories came up.
>
> Q: How did it come up?
>
> A: I believe it was brought up because we reported that we had Mr. Evans trying to reconcile the inventories to make sure there was no missing gold. Mr. Kirk

was particularly interested in that because he said that it reflected badly on him if there was missing gold.

Q:  Did Mr. Robol say anything?

A:  Mr. Robol really said so you found these inventories.  We [sic] said, yes, we found them.  And he referenced that the inventories were part of the materials that Mr. Thompson, who had been the CEO of Columbus Exploration, had not wanted turned over to the court as part of a court proceeding.

Q:  Did he say why?

A:  Yes.  He said that Thompson was a secrecy [sic] -- had great concerns about secrecy and confidentiality and therefore didn't want to share materials unless he was absolutely forced to.

Dispatch argues that Henson's testimony conclusively shows that Robol knew about the existence of other inventories and intentionally misled the court when he said that the California-Gold-sale inventory was the only inventory in the defendants' possession.

We find Dispatch's arguments to be highly persuasive.  The aforementioned facts provide powerful evidence that Robol knew of, or was willfully blind to, the existence of undisclosed inventories.  As a result, there is a strong inference that Robol intentionally misled the district court for the purpose of hampering the enforcement of the 2006 consent order.

Robol's response to Dispatch's compilation of evidence is weak.  He argues that, although he knew that undisclosed inventories existed at certain points in time, he did not know that they existed in the defendants' possession—in the basement of his duplex—during the times that he stated that the California Gold sale inventory was the only inventory in the defendants' possession.  Robol suggests that "[n]obody knows where the recovered inventories resided" before their discovery in 2013, and "the documents could have been *anywhere* between 2006 and 2009."

Furthermore, Robol notes that the undisclosed inventories were discovered in the side of the duplex that he leased to the defendants—431 West Sixth Avenue—rather than the side in which his law office was located—433 West Sixth Avenue.  According to Robol the "two areas had separate entrances and were sealed off from one another."  Robol argues that he could not

legally have gone into the defendants' side of the building to search their files without their authorization; therefore he had no choice but to rely on the statements of his clients, which he believed to be true at the time of his misrepresentations.

The fatal flaw in both of these arguments is that, even if we assume that Robol did not know the specific fact that the inventories were located in his duplex during his misrepresentations—a claim of which Robol has not convinced us—Robol surely had enough knowledge about the inventories that when his clients told him that the California-Gold-sale inventory was all they had, he could not have believed that statement. Given Robol's composition of the 1991 letter to Bank One, representation in the Virginia admiralty litigation, interactions with Bob Evans, and conversation with Jim Henson, not even believing in "six impossible things before breakfast" could lead to the conclusion that Robol reasonably believed that his clients did not possess additional inventories. Lewis Carroll, *Through the Looking-Glass, and What Alice Found There* 100 (1872). Jim Henson's testimony regarding his conversation with Robol is particularly incriminating, as Henson testified that Robol admitted that he knew about the existence of additional inventories in the defendants' possession and purposely hid them from the court. By making misrepresentations about those inventories, Robol hampered the enforcement of the district court's 2006 consent order in bad faith. For that reason, we hold that the district court did not abuse its discretion when it concluded that Henson engaged in sanctionable bad-faith conduct.

## IV. Calculation of Sanctions

The district court imposed $224,580 in sanctions on Robol, which was its calculation of "the amount equal to the cost of pursuing this Motion for Sanctions, as well as the amount expended . . . to uncover this fraud and locate the inventories uncovered by the Receiver." Robol raises two arguments for why this calculation was an abuse of discretion. First, he argues that the $224,580 in fees incurred by Dispatch is not entirely attributable to his individual conduct in the litigation. Second, he argues that, because Dispatch already received a $700,000 settlement from a codefendant, Gilman Kirk, Dispatch has already been fully compensated and would be receiving a windfall.

Neither of these arguments is persuasive because they are premised on the idea that sanctions are meant to be solely restitutive. It is well established under Supreme Court and Sixth Circuit precedents that a court's inherent power to sanction serves a punitive purpose, based on the need to deter misconduct and vindicate the court's authority. In *Chambers*, the Supreme Court stated that courts' inherent power to sanction serves the "dual purpose" of "vindicate[ing] judicial authority" and "mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy." 501 U.S. at 46 (quoting *Hutto*, 437 U.S. at 689 n.14). In that case, Chambers had argued that the district court "failed to tailor the sanction to the particular wrong." *Id.* at 56. The Supreme Court disagreed, holding that because the district court needed "to ensure that such abuses were not repeated," it was "within the court's discretion to vindicate itself and compensate NASCO by requiring Chambers to pay for all attorney's fees." *Id.* at 57.

In *Stalley ex rel. United States v. Mountain States Health Alliance*, Stalley challenged the district court's exercise of its inherent power to sanction on the ground that the court did not explain why it had to award the defendants all of their fees and expenses ($276,589.69) in order to assure the desired deterrence. 644 F.3d 349, 351–52 (6th Cir. 2011). We noted that "sanctions imposed . . . pursuant to a court's inherent authority" are "punitive." *Id.* at 352 (quoting *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 647 (6th Cir. 2006)). Therefore, "even assuming that the award was greater than necessary to deter future violations—a contention of which Stalley has failed to convince us—another valid basis exists for the award that Stalley has not challenged." *Ibid.* In *Red Carpet Studios*, the case quoted in *Stalley*, we held that a district court can award sanctions that are less than the harm that was suffered by the opposing party. 465 F.3d at 647. In that context we stated that "sanctions imposed . . . pursuant to a court's inherent authority are punitive." *Ibid.*

*Chambers*, *Stalley*, and *Red Carpet Studios* establish that courts have broad discretion under their inherent powers to fashion punitive sanctions. Although sanctions cannot be so unreasonable that they constitute an abuse of discretion, there is no requirement of a perfect causal connection between the sanctioned conduct and the attorney's fees awarded, due to the punitive nature of the sanctions. In this case, the sanctions imposed by the district court—"equal to the cost of pursuing this Motion for Sanctions, as well as the amount expended . . . to uncover

this fraud and locate the inventories uncovered by the Receiver"—are reasonably punitive and within the district court's discretion.

Dispatch's $700,000 settlement with Gilman Kirk does not change our assessment. Dispatch originally moved for sanctions against four individuals: Robol, plus three executives from the defendant businesses, Gilman Kirk, Tommy Thompson, and Michael Ford. That motion sought $1,717,388, the entire cost of the litigation. Awarding Dispatch $224,580 from Robol would still leave it with much less than the entire cost of the litigation. As such, it does not strike us as a windfall for Dispatch, although it does strike us as a reasonable punishment for Robol. We hold that the district court did not abuse its discretion when it sanctioned Robol for the cost of uncovering his fraud and pursuing the motion for sanctions.

## V. Conclusion

The district court's order is AFFIRMED.