PRESENT: Lemons, C.J., Goodwyn, Mims, Powell, McCullough, Chafin, JJ., and Russell, S.J.[1]

RICHARD THOMAS ROBOL

v. Record No. 210054

VIRGINIA STATE BAR

OPINION BY
JUSTICE WILLIAM C. MIMS
JANUARY 6, 2022

FROM THE VIRGINIA STATE BAR DISCIPLINARY BOARD

In this appeal of right, Richard Thomas Robol challenges a decision of the Virginia State Bar Disciplinary Board, which suspended his license to practice law for four years. Upon review, we find no error in the Board's decision.

I.    BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Robol was licensed to practice law in Virginia in 1979. Between 1979 and 2002, he maintained active status. He elected to take associate status between 2002 and 2003, and then returned to active status between 2003 and 2016. Since 2016, he has maintained associate status. He also was licensed to practice law in Ohio from 1996 until 2019, when the Supreme Court of Ohio accepted Robol's application for retirement or resignation with disciplinary action pending.

From the early 1980s through 2014, Robol represented Thomas Thompson and various entities controlled by Thompson related to the search for and salvage of the *S.S. Central America*. In 1857, the *S.S. Central America* was carrying more than 580 passengers and millions of dollars in gold when it ran directly into a hurricane off the coast of South Carolina. *Columbus-Am. Discovery Grp. v. Atl. Mutual Ins. Co.*, 974 F.2d. 450, 456 (4th Cir. 1992).

---

[1] Chief Justice Lemons presided and participated in the hearing and decision of this case prior to the effective date of his retirement as Chief Justice on December 31, 2021. Justice Goodwyn was sworn in as Chief Justice effective January 1, 2022.

Although 153 persons were rescued by passing ships, the remaining passengers and precious cargo were lost at sea. *Id.*

Advances in sonar-search and deep-sea-recovery technology brought renewed interest in locating the *S.S. Central America* in the late 1970s and 1980s. *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 614 (6th Cir. 2013). Thompson and his colleagues located the ship in 1988 off the coast of South Carolina. *Id.* Using a submersible robot, they removed millions of dollars' worth of gold coins, ingots, and bars from the wreckage. *Id.* The discovery of this treasure spawned numerous lawsuits in Virginia and Ohio, and Robol was involved in much of this litigation over several decades.

### The 1991 Loan Letter

The efforts associated with recovering the treasure were costly. In 1991, Robol assisted Thompson and his business in their efforts to obtain a loan from Bank One. Robol sent a letter to Bank One on October 28, 1991, which included as an attachment a 43-page inventory of the treasure recovered to that date from the *S.S. Central America*. This inventory is subsequently referred to as the "1991 Inventory."

### The Virginia Admiralty Litigation

Robol represented Thompson and Columbus-America Discovery Group in an admiralty case in the 1990s in the United States District Court for the Eastern District of Virginia ("Virginia District Court"). This litigation dealt with subrogation claims of insurance companies that had paid claims when the *S.S. Central America* sank. As part of this litigation, an inventory of the recovered treasure was prepared for the Virginia District Court that is referred to as the "Holabird Inventory." At the conclusion of that litigation, the Virginia District Court ruled that Columbus-America was entitled to a salvage award of 90% of the recovered treasure, and the

2

remainder was divided among various insurance companies. That award was subsequently

affirmed by the United States Court of Appeals for the Fourth Circuit. *Columbus-America*

*Discovery Group v. Atlantic Mut. Ins. Co*., 56 F.3d 556, 562 (4th Cir. 1995); *see also*

*Williamson*, 731 F.3d at 615.

### The Ohio Litigation

Later, in 2005, Robol again represented Thompson and certain entities he controlled –

Columbus Exploration, LLC ("CX") and Recovery Limited Partnership ("RLP") – in a lawsuit

brought by the Dispatch Printing Company ("DPC") in Franklin County, Ohio for breach of

fiduciary duty and accounting. DPC had invested a substantial amount of money in Thompson's

efforts to recover the gold but had not realized a return on its investment. In 2006, these cases

were consolidated with another admiralty case and removed to the United States District Court

for Southern District of Ohio (the "Ohio District Court").

On July 20, 2006, the Ohio District Court entered a Consent Order, in which it directed

the defendants to provide DPC's forensic accountant, KPMG, with "full access and opportunity

to review" certain identified documents and materials, regardless of their date. After entry of

this Consent Order, the Ohio District Court held the defendants in contempt on two occasions for

violations of the Consent Order. On December 5, 2006, the court found "a total lack of good

faith" on the part of CX and RLP for failing to turn over documents related to the inventory and

sale of gold, expressing skepticism that such critically important documents could not be located.

In response to the December 5, 2006 contempt order, the defendants turned over one inventory –

an inventory of the gold they sold to California Gold Marketing Group in 2000 (the "CGMG

Inventory").

3

In April 2007, the defendants submitted a "certification" in which they asserted the CGMG Inventory was the only one they possessed. Robol personally repeated this assertion to the Ohio District Court. DPC argued there had to be inventories older than the CGMG Inventory. Robol responded, "We have produced the inventories, even if they are pre-2000 inventories. I don't want there to be any ambiguity … about that. We have produced the inventories." The court then ordered the defendants to turn over "anything that could be construed as an inventory of any kind regarding assets recovered from the shipwreck." In response, the defendants submitted another "certification" in which they disclosed the existence of the "Holabird Inventory" that had been commissioned by the Virginia District Court during the admiralty litigation in 1997, although they claimed not to have a copy of it.

On September 7, 2007, the Ohio District Court held a hearing and expressed its concern that no successful accounting could be accomplished without an inventory of the recovered gold. During this hearing, Robol stated to the court, "Now let me address the specifics of the inventory. What you have been told is false, false, false. The company has no inventories of the gold sold other than what has been provided." The court then ordered Robol to obtain the Holabird Inventory from the Virginia District Court.

Robol appealed this decision to the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") and asked for a stay of the order to produce the Holabird Inventory. While his appeal was pending, the Virginia District Court granted Robol access to the Holabird Inventory on September 20, 2007. The Sixth Circuit denied the stay and dismissed the appeal on February 8, 2008. Robol, however, did not tender the Holabird Inventory to KPMG until August 2008, eleven months after the Virginia District Court authorized its release.

In a trial brief Robol filed on December 3, 2008, he stated the defendants had "produced the only inventory in their possession in late 2006, which was the inventory of the gold items sold to the California Gold Marketing Group." Similarly, at a hearing on December 8, 2008, Robol told the Ohio District Court that "[w]e produced the one and only inventory that the company had, which was the inventory relating to the sale to the party that we have spoken about, the California Gold Marketing Group."

In September 2009, the Ohio District Court again found the defendants in contempt and sanctioned them, finding they had "sandbagged" the accounting through various means and had caused "significant delay and expense." The Ohio District Court found there was no reasonable justification for Robol's delay in turning over the Holabird Inventory. Robol raised two arguments to defend the delay. The first was that the defendants were not required to turn over this inventory while they had an appeal pending, and the second was that KPMG refused to sign a document Robol had drafted, purportedly to be bound by the Virginia District Court's orders on confidentiality.

The Ohio District Court rejected both arguments. First, the court found that there was no excuse for the delay in producing the Holabird Inventory because the Sixth Circuit had denied the stay and dismissed the appeal in February 2008. Second, the court concluded that the document Robol demanded that KPMG sign contained additional terms and conditions not required by the Virginia District Court, such as to "irrevocably submit to the jurisdiction" of that court. Additionally, the Ohio District Court found that no confidentiality agreement was required since the 2006 Consent Order already required KPMG to be bound by a confidentiality provision. Lastly, Robol did not even attempt to get KPMG to sign a confidentiality agreement until August 2008, almost one year after he received the Holabird Inventory from the Virginia

5

District Court. The Ohio District Court ruled that this delay added significant cost and delay to the audit.

Robol appealed certain rulings of the Ohio District Court to the Sixth Circuit. In briefs filed with that court, he made similar representations about the defendants having turned over the only inventory they possessed. In a March 19, 2010 brief, Robol stated, "The first inventory – the only inventory that Columbus Exploration had in its possession, custody or control – was provided to KPMG shortly after the December 5, 2006 Order…. [That] inventory listed every item of gold treasure sold to the California Marketing Group." Robol reiterated that claim again in a June 1, 2010 reply brief.

DPC subsequently sought the appointment of a receiver for CX and RPL to take control of these companies, "dissolve them and liquidate their assets, and wind up their affairs." This portion of the case was then remanded back to Ohio state court. The receivership proceedings were interrupted in February 2013 when Robol filed an involuntary bankruptcy petition against CX as a creditor in an attempt to block the appointment of a receiver. On May 20, 2013, however, the bankruptcy court granted relief from the automatic stay, and three days later, the Ohio state court granted DPC's receivership motion. A receiver was appointed and served notice on all the companies' attorneys, including Robol, to turn over all company files and property in their possession. The receiver recovered 36 file cabinets of CX and RPL records from 431 West 6th Avenue in Columbus, Ohio. This was a duplex owned by Robol in which he had his law offices on one side of the building and leased the other side of the building to the defendants. These files were retrieved between July 25 and August 1, 2013.

Within "a few hours" of searching the file cabinets, the receiver discovered multiple original inventories of the treasure. The inventories were found on hundreds of pages of "fan-

6

fold" computer paper, bound by hard cover and labeled "Master Coin and Bar." There were also inventories found on computer discs. In addition, despite Robol's April 24, 2007 in-court denial that the defendants had any documents relating to sales of the gold, the receiver uncovered documents relating to "downstream" sales of the gold sold to CGMG, in which RLP maintained a 25% profit participation.

### *Robol is Sanctioned*

After learning of the discovery of these documents, DPC filed a motion for sanctions against Robol[2] on October 16, 2013, alleging he acted in bad faith in repeatedly failing to produce the original inventories of gold necessary for DPC to conduct an accounting of the finances of defendants CX and RPL. DPC argued Robol knew or should have known his representations to the court were false. Robol admitted the recently discovered inventories and sales reports should have been produced pursuant to the 2006 Consent Order, but argued he did nothing wrong because he reasonably relied on representations from his client, Thompson, that all responsive documents had been provided.

The Ohio District Court held a three-day hearing on DPC's motion for sanctions. At this hearing, James Henson, the financial advisor for the receiver, described the multiple inventories he found within a few hours of searching through the file cabinets, including copies of the 1991 Inventory and the Holabird Inventory. They also found thousands of copies of cards used to log each specific piece of treasure. Henson also testified regarding a meeting he had with Robol and one of the CX board members in September 2013, after the inventories had been discovered in

---

[2] The motion was also against three executives from the defendant businesses – Thompson, Gilman Kirk, and Michael Ford. Kirk and Ford settled with DPC for $700,000. At the time of the motion, Thompson was a fugitive. He has since been arrested and held in a federal prison for contempt of court for the past five years for refusing to disclose the location of missing gold. Accordingly, the motion for sanctions proceeded against only Robol.

the file cabinets. As Henson explained how they were attempting to reconcile the various inventories to determine if any gold was missing, Robol said, "so you found those inventories." Henson responded, "yes, we found them." Robol then referenced that the inventories were part of the materials Thompson had not wanted turned over to the court. Robol explained Thompson had great concerns about secrecy and confidentiality and did not want to share materials unless absolutely forced to.

The Ohio District Court held that "Robol knew, or should have known, that his clients possessed other inventories relating to the recovered treasure, as evidenced by his participation in the Eastern District of Virginia's admiralty litigation, and as shown by his mailing of one such inventory to Bank One on October 28, 1991." The court found that "Robol should have known in 2007, when questioned by this Court, of the existence of such other inventories, when he informed the Court that his clients had produced 'all the inventories they ever possessed.'" The court also found Robol relied on his clients to search for other inventories, while he undertook only limited searching of the records stored at 431 West 6th Avenue, over which he had control and access.

The court held there was clear and convincing evidence to conclude Robol unreasonably relied on his clients and acted willfully to blind himself from the truth of his and his clients' possession of other inventories. The court found that Robol did not adequately participate in and oversee the collection process, and that he did not exercise sufficient oversight. Significantly, the court also found that Robol did not make the required "reasonable inquiry" such that the court could conclude his reliance on his clients' assertions was appropriate under the totality of

8

the circumstances. The totality of the circumstances included Robol's personal awareness of the existence of other inventories, due to his longstanding role as counsel to the defendants. The court stated Robol was obligated to inform the court of everything he was aware of instead of participating in his clients' obfuscation. The court concluded Robol acted in bad faith by representing to the court and the Sixth Circuit, on multiple occasions, that his clients had no other inventories and that no other inventories even existed. The court determined Robol's conduct rose beyond mere bad faith to the level of "fraud on the court." The court found DPC had proven that Robol, an officer of the court, had committed misconduct "directed at the judicial machinery itself," and had deceived the court.

The Ohio District Court recognized the behavior here was not of the extreme nature seen in the most flagrant examples of fraud on the court such as bribing a judge or jury tampering. Nevertheless, it found "the necessity of an officer of the Court to respond honestly and fully to the Court's orders is an integral component of the proper functioning of our system of justice." The court ultimately emphasized that "Robol's unreasonable reliance on the statements of his clients, his failure to verify the truthfulness of his representations to this Court, and his firsthand knowledge of the falsity of his statements, compel[] this Court to conclude that he has acted in bad faith, and further acted to commit a fraud upon the court." The court then sanctioned Robol in the amount of $224,580, the amount of DPC's costs in pursuing the motion for sanctions, uncovering the fraud, and locating the inventories.

Robol appealed the Ohio District Court's rulings to the Sixth Circuit, which affirmed the imposition of sanctions. *Williamson v. Recovery Limited Partnership,* 826 F.3d 297, 299 (6th Cir. 2016). The Sixth Circuit determined the Ohio District Court applied an incorrect test to determine bad faith and fraud. However, after applying the proper test, the Sixth Circuit found

9

that Robol had hampered the enforcement of a court order in bad faith. *Id.* at 302-03.

The Sixth Circuit held that by refusing to notify the Ohio District Court of the existence of inventories created prior to the CGMG Inventory and by falsely claiming that this inventory was the only one in the defendants' possession, Robol hampered enforcement of the 2006 Consent Order. *Id.* at 303. The Court rejected Robol's arguments that although he knew the undisclosed inventories existed, he did not know the defendants still possessed them during the times he represented to courts that the CGMG Inventory was the only inventory in the defendants' possession. *Id.* at 305. The Sixth Circuit ruled, "even if we assume that Robol did not know the specific fact that the inventories were located in his duplex during his misrepresentations – a claim of which Robol has not convinced us – Robol surely had enough knowledge about the inventories that when his clients told him that the [CGMG] Inventory was the only one they had, he could not believe that statement." *Id.*

Citing page 100 of Lewis Carroll's *Through the Looking Glass, and What Alice Found There* (1872), the Court held that, given Robol's composition of the 1991 letter to Bank One, his involvement in the Virginia admiralty litigation, his interactions with Robert Evans, who was the curator of the treasure in the 1980s and 1990s, and his comments to James Henson after the inventories were discovered, "not even believing in 'six impossible things before breakfast' could lead to the conclusion that Robol reasonably believed that his clients did not possess additional inventories." *Id.* The Court concluded that by making misrepresentations about those inventories, Robol hampered the enforcement of the 2006 Consent Order in bad faith, and therefore the Ohio District Court did not abuse its discretion when it held Robol engaged in sanctionable bad faith conduct. *Id.*

10

*Virginia State Bar Proceedings*

On February 6, 2020, the Second District Subcommittee certified multiple charges of misconduct against Robol, alleging he had violated both Ohio and Virginia Rules of Professional Conduct by the misrepresentations he made to the Ohio District Court and the Sixth Circuit regarding the existence, or lack thereof, of different inventories.

The Disciplinary Board held a two-day hearing on September 24-25, 2020. The Bar did not present any live witnesses, but instead presented numerous exhibits as its evidence of Robol's misconduct. These included the orders and records from litigation in the Ohio District Court, the Sixth Circuit, and the Virginia District Court.

Robol introduced affidavits from several employees of Thompson's companies, who stated Robol had instructed them to look for documents responsive to the 2006 Consent Order, but they never found any copies of other inventories or sales reports. He also introduced prior deposition testimony in which Thompson denied ever instructing anyone to withhold documents and asserted they had searched their records and could not find any prior inventories.

Robol admitted he was aware of the 1991 Inventory and the Holabird Inventory. Robol testified Thompson's company operated on a need-to-know basis, and inventories were viewed as trade secrets. Thompson had a policy that only one inventory existed at a time. When a new inventory was prepared, the old inventory was destroyed. Robol testified he had paid the full amount of the sanctions ordered by the Ohio District Court. He reiterated that, at the time he made the representations to the Ohio courts, he did not believe the company possessed any other inventories.

At the conclusion of this hearing, the Board issued a summary order in which it found, by clear and convincing evidence, Robol had violated Rules 3.3(a)(1), 3.3(b), 3.4(a), 3.4(c), 4.1(b),

11

8.4 (c), and 8.4(d) of the Ohio Rules of Professional Conduct. The Board found the alleged violations of Ohio Rules 1.2(d)(1) and 1.9(c)(1) and Virginia Rules 1.9(c)(1) and 3.1 had not been proven by clear and convincing evidence and dismissed those charges.

During the sanctions portion of the hearing, the Bar asked for Robol's license to be revoked. In response, Robol requested a six-month suspension. Robol never argued that he was entitled to retire or resign with a disciplinary complaint pending, as he was permitted to do in Ohio. He also never argued the Board lacked jurisdiction to discipline him because he was an associate member of the Bar as opposed to an active member. The Board determined the appropriate sanction was a four-year suspension.

Robol filed a motion for reconsideration. He attached a declaration from Thompson, who was in federal prison on civil contempt charges for failing to disclose the location of 500 missing gold coins. Thompson's declaration set forth his document retention policy and how Robol would not have been aware of the other inventories. In his motion for reconsideration, Robol never raised a challenge to the Board's authority, or lack thereof, to discipline him as an associate member of the Bar or to provide a sanction that was different from what was available in Ohio.

The Board denied the motion for reconsideration in a footnote in its Memorandum Order of Suspension, which was issued on October 5, 2020. In its Memorandum Order, the Board determined it had the authority to discipline Robol for violations of the Ohio Rules of Professional Conduct based on Rule 8.5[3] of the Virginia Rules of Professional Conduct. The

---

[3] Rule 8.5 provides that a lawyer admitted to practice in Virginia is subject to the disciplinary authority of Virginia regardless of where the lawyer's conduct occurs. It also contains a choice of law provision, which states that for "conduct in connection with a proceeding in a court, agency, or other tribunal before which the lawyer appears, the rules to be applied shall be the rules of the jurisdiction in which the court, agency, or other tribunal sits."

Board held Robol violated Ohio Rule 3.3 (a)(1) and (b), which governs "candor toward the tribunal," and Rule 4.1, "truthfulness in statements to others," when he repeatedly represented to the Ohio District Court and the Sixth Circuit that his clients had produced the only inventory in their possession. The Board found that, by virtue of his prior representation of his clients in the Virginia District Court and in connection with the 1991 Bank One loan, Robol knew these statements were untrue. Further, his misrepresentations allowed his clients to conceal these documents, which was a fraudulent act. Next, the Board held Robol violated Ohio Rule 3.4 (a) and (c), governing "fairness to opposing counsel," when he failed to timely produce the Holabird Inventory after the Virginia District Court authorized its release and by pursuing a baseless interlocutory appeal of the Ohio District Court's order requiring production of the inventory. Lastly, the Board found Robol violated Ohio Rule 8.4, governing "misconduct," by repeatedly ignoring the orders of the Ohio District Court to produce the 1991 Inventory and the Holabird Inventory, which delayed resolution of those cases by years and resulted in significant delay and expense for the plaintiffs.

## II.     ANALYSIS
### A.   Associate Status

Robol argues the Board lacked authority to discipline him because he was an associate member of the Virginia Bar and not actively providing legal services in Virginia. He contends an associate member is essentially a "non-lawyer" and not subject to discipline by the Virginia State Bar. We reject this argument.

The Virginia Rules of Professional Conduct are Rules of this Court. *See* Code § 54.1-3909. The interpretation of the Disciplinary Rules is a question of law we review de novo. *Zaug v. Virginia State Bar*, 285 Va. 457, 462 (2013).

13

First, our Rules state that "every person licensed by the Virginia Board of Bar Examiners or admitted by the Supreme Court of a Virginia is a member of the Virginia State Bar." Part 6, § 4, Para. 2. Paragraph 13-1, which governs the "Procedure for Disciplining, Suspending, and Disbarring Attorneys," defines an attorney as "a member of the Bar, a Corporate Counsel Registrant, Foreign Lawyer, Foreign Legal Consultant, and any member of the bar of any other jurisdiction while engaged, *pro hac vice* or otherwise, in the practice of law in Virginia." Part 6, § 4, Para. 13-1. Paragraph 3 sets forth the six classes of members: active, associate, judicial, disabled, retired, and emeritus. Associate members "are entitled to all the privileges of active members except that they cannot practice law, vote nor hold office (other than as members of committees) in the Virginia State Bar." Part 6, § 4, Para. 3. Associate members are required to pay dues equivalent to half the amount paid by active members. Part 6, § 4, Para. 11. They may "reactivate" their status at any time; all that is required is payment of the full annual dues and certain additional fees, completion of MCLE obligations, and a Professional Liability certification. The plain language of these Rules establishes that associate members are attorneys who remain subject to the Bar's jurisdiction and regulation.

Second, we have already rejected a similar argument made in *Barrett v. Virginia State Bar*, 277 Va. 412 (2009). Barrett was a member of the Virginia Bar whose license was suspended. *Id.* at 413. While his license was suspended, Barrett was charged with additional violations of the Virginia Rules of Professional Conduct, and after a hearing before a three-judge panel, his license was revoked. *Id.* Barrett argued that because his license was suspended, he was a "non-lawyer" and therefore the three-judge panel "lacked jurisdiction to try a non-lawyer

14

under the rules of professional conduct." *Id.* We rejected his argument, holding it would be "a manifest absurdity and a distortion of the Rules" if they were applied in such a manner. *Id.* at 414. "A lawyer would be able to escape accountability for a violation of the Rules by using a license suspension as a permit to offend even more." *Id.*

In reaching this conclusion, we adopted the following distinction:

> Disbarment is the severance of the status and privileges of an attorney, whereas suspension is the temporary *forced* withdrawal from the exercise of office, powers, prerogatives, and privileges of a member of the bar.

*Id.* at 415 (emphasis added). A member of the Virginia Bar who has taken associate status has essentially taken a voluntary withdrawal, as opposed to a forced one, from certain privileges of a member of the Bar. However, as discussed above, an associate member may "reactivate" their status at any point by complying with a few minor regulatory requirements.

Following Robol's argument to its conclusion reveals its absurdity. Despite findings by the Ohio District Court and the Sixth Circuit that Robol engaged in bad faith and fraudulent conduct, the Bar would be without any power to regulate him because he was not an active member of the Bar. Robol could then reactivate his membership, thereby escaping any accountability for his actions while an associate member. Such an outcome would conflict with the Bar's mission "(1) to protect the public, (2) to regulate the legal profession of Virginia, (3) to advance access to legal services, and (4) to assist in improving the legal profession and the judicial system." Accordingly, we hold the Bar acted within its authority when it pursued disciplinary action against Robol for actions committed while he was an associate member of the Bar.

15

B.  Sufficiency of the Evidence

Robol argues the Board erred in finding any violations of the Ohio Rules of Professional Conduct.[4]  First, he contends the Board failed to give sufficient weight to the order of the Virginia District Court that anyone seeking access to the Holabird Inventory was required to submit to that court's jurisdiction and confidentiality orders.  Second, he asserts the Board failed to apply the legal standards in effect in Ohio during the relevant period when it concluded Robol had breached certain provisions of the Ohio Rules of Professional Conduct.

The standard of review we employ in reviewing a matter of attorney discipline is familiar and well-settled:

> We conduct an independent examination of the entire record. We consider the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Bar, the prevailing party [below]. We accord the [Board's] factual findings substantial weight and view those findings as prima facie correct. Although we do not give the [Board's] conclusions the weight of a jury verdict, we will sustain those conclusions unless it appears that they are not justified by a reasonable view of the evidence or are contrary to law.

*Pappas v. Va. State Bar*, 271 Va. 580, 585-86 (2006) (quoting *Anthony v. Va. State Bar*, 270 Va. 601, 608-09 (2005)).  Upon reviewing the present case under these established legal standards, we conclude the Board did not err when it determined Robol violated Rules 3.3, 3.4, 4.1, and 8.4 of the Ohio Rules of Professional Conduct.

---

[4] Although Robol's assignments of error refer to the "Ohio Code of Professional Responsibility," the Supreme Court of Ohio adopted the Ohio Rules of Professional Conduct effective February 1, 2007, superseding and replacing the Ohio Code of Professional Responsibility.

16

*Rule 3.4*

Ohio Rule 3.4, which governs "Fairness to Opposing Party and Counsel," states as follows:

> A lawyer shall not do any of the following:
>
> (a) Unlawfully obstruct another party's access to evidence; unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value; or counsel or assist another person to do any such act;
>
> (b) Knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on a good faith assertion that no valid obligation exists[.]

The Board found that Robol violated this rule by failing to produce the Holabird Inventory once the Virginia District Court authorized its release, and by pursuing a baseless interlocutory appeal of the Ohio District Court's order requiring production of the inventory. Robol contends the reason for his delay in turning over the Holabird Inventory was because KPMG would not agree to consent to the jurisdiction and be bound by the confidentiality order of the Virginia District Court, and that he was merely attempting to comply with that order. Robol also argues that Ohio law "does not require futile or vain acts," and because KPMG refused to sign the confidentiality agreement that he drafted for it to have access to the Holabird Inventory, KPMG was therefore responsible for its lack of access.

Robol's arguments simply are not supported by the record. Despite representing to the Ohio District Court in April 2007 that his clients had "produced all the inventories," in June 2007 Robol admitted the existence of the Holabird Inventory, which had been filed under seal in the Virginia District Court in 1998. Robol was aware of it since he had represented the defendants during the Virginia admiralty litigation. On September 7, 2007, the Ohio District Court ordered Robol to obtain the Holabird Inventory from the Virginia District Court and turn it

over to KPMG. On September 20, 2007, the Virginia District Court granted Robol access to the Holabird Inventory.

Instead of tendering the Holabird Inventory to KPMG then, as permitted by the Virginia District Court, Robol appealed the Ohio District Court's order. Even if Robol had a good faith basis to initially withhold the document pending his request for a stay and his appeal of the Ohio District Court's order, the Sixth Circuit dismissed his appeal in February 2008. Robol, however, did not attempt to tender the Holabird Inventory to KPMG until August 2008. Robol has provided no explanation for this delay. Based upon this evidence and viewing all inferences in the Bar's favor as the prevailing party below, we cannot say the Board erred in holding that Robol violated Ohio Rule 3.4 by obstructing the plaintiffs' access to the Holabird Inventory and knowingly disobeying the Ohio District Court's order to turn it over.

### Rules 3.3, 4.1, and 8.4

Ohio Rule 3.3 governs "Candor toward the Tribunal," and states in relevant part:

> (a) A lawyer shall not knowingly do any of the following:
> (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
> . . . .
> (b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person, including the client, intents to engage, is engage, or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable measure to remedy the situation, including, if necessary, disclosure to the tribunal.

Ohio Rule 4.1 governs "Truthfulness in Statements to Others." It states in relevant part:

> In the course of representing a client a lawyer shall not knowingly do either of the following:
> . . . .
> (b) fail to disclose a material fact when disclosure is necessary to avoid assisting an illegal or fraudulent act by a client.

18

Ohio Rule 8.4 governs "Misconduct" and states in relevant part:

> It is professional misconduct for a lawyer to do any of the
> following:
>
> . . . .
>
> (c) Engage in conduct involving dishonesty, fraud, deceit, or
> misrepresentation;
>
> (d) Engage in conduct that is prejudicial to the administration of
> justice.

Robol never argued to the Board that it should apply the specific Ohio legal standards he now sets forth. Yet, even when those standards are applied to these facts, the Board's holdings are supported by the record.

Citing comments to Ohio Rule 3.3, Robol argues that a "representation by counsel" can be based on information provided by a client and does not require counsel to have personal knowledge of the matter. He claims that, from the beginning, he made clear to the Ohio District Court that he was relying upon information provided by his clients with respect to the inventories, and there was no evidence he had personal knowledge these claims were untrue. Robol further argues he was merely following Comment 8 to Ohio Rule 3.3, which directs attorneys to "resolve doubts about the veracity of testimony or other evidence in favor of the client."

In his brief, Robol omits a key portion of this Comment. The full sentence states that, "[t]hus, although a lawyer should resolve doubts about the veracity of testimony or other evidence in favor of the client, *the lawyer cannot ignore an obvious falsehood.*" Ohio Rule 3.3, Comment [8]. The Sixth Circuit directly addressed this point, holding that "even if we assume that Robol did not know the specific fact that the inventories were located in his duplex during his misrepresentations – a claim of which Robol has not convinced us – Robol surely had enough knowledge about the inventories that when his clients told him that the California-gold-sale

19

inventory was all they had, he could not have believed that statement." *Williamson,* 826 F.3d at 305. The Sixth Circuit elaborated, "[g]iven Robol's composition of the 1991 letter to Bank One, representation in the Virginia Admiralty litigation, interactions with Bob Evans, and conversations with Jim Henson, not even believing in 'six impossible things before breakfast' could lead to a conclusion that Robol reasonably believed that his clients did not possess additional inventories." *Id.* The Sixth Circuit found Henson's testimony regarding his conversation with Robol "particularly incriminating," as Henson stated Robol admitted that he knew about the existence of additional inventories and "purposefully hid them from the court." *Id.* The Sixth Circuit held that by making those misrepresentations, Robol hampered enforcement of the 2006 Consent Order in bad faith. *Id.*

We reject Robol's argument that the Board's decision failed to follow the mandate under Ohio law that a lawyer should resolve doubts about the veracity of testimony or other evidence in favor of the client, or that Robol was entitled to rely on his clients' representations, because the record proves Robol knew his clients' representations regarding the inventories were false. Robol repeatedly made statements to the Ohio District Court and the Sixth Circuit that he knew were false. These actions caused significant delays in the resolution of the Ohio litigation, and additional costs to all the parties, which was prejudicial to the administration of justice. Accordingly, we conclude the Board did not err when it determined Robol violated Rules 3.3, 4.1, and 8.4 of the Ohio Rules of Professional Conduct.

### C. Appropriate Sanction

Relying on our decision in *Cummins v. Virginia State Bar*, 233 Va. 363 (1987), Robol argues that applying a different sanction than what he received in Ohio is contrary to Rule 8.5 of the Virginia Rules of Professional Conduct and reciprocal enforcement. He contends he should

20

have been afforded the option of resigning from the Virginia State Bar, as he did in Ohio. However, Robol never made this argument to the Board at his sanctions hearing. Instead, he argued the appropriate sanction was to suspend his license for six months. Accordingly, Robol has waived this argument, and we decline to address it. Rule 5:25.

### III. CONCLUSION

In summary, we conclude the Board had jurisdiction to discipline Robol as an associate member of the Virginia State Bar. We further conclude that substantial evidence in the record supported the Board's determination that Robol violated Rules 3.3, 3.4, 4.1, and 8.4 of the Ohio Rules of Professional Conduct. For these reasons, we affirm the order of the Board.

*Affirmed.*